**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David T. DELLINGER et al., Defendants-
Appellants.**

**No. 18295.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1972.

Decided Nov. 21, 1972.
Certiorari Denied March 5, 1973.
See 93 S.Ct. 1443.

344

Arthur Kinoy, Helene E. Schwartz, Doris Peterson, Center for Constitutional Rights, New York City, William W. Brackett, Chicago, Ill., Stuart S. Ball, Jr., Newark, N. J., William M. Kunstler, Center for Constitutional Rights, New York City, Thomas M. Haney, Thomas P. Sullivan, Chicago, Ill., Morton Stavis, Center for Constitutional Rights, New York City, Leonard I. Weinglass, Newark, N. J., for defendants-appellants.

James R. Thompson, U. S. Atty., Jeffrey Cole, James Breen, Royal Martin, Jr., Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Alan S. Ganz, Chicago, Ill., for amicus curia.

Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.

FAIRCHILD, Circuit Judge.

These are appeals from convictions of violation of the 1968 federal Anti-riot Act.[1] The charges arose out of events in Chicago during the last week of August, 1968, during the national convention of the Democratic party. There were several violent encounters between the city police and other persons in the streets and parks. The degree of responsibility of the five present appellants and the intent with which they acted are the focal issues.

The appellants are David Dellinger, Rennie Davis, Tom Hayden, Abbie Hoffman, and Jerry Rubin. They, along with Bobby Seale, were charged with making certain speeches for the purposes of inciting, organizing, promoting, and encouraging a riot, after having traveled in interstate commerce to Chicago with intent to do so. Codefendants Froines and Weiner were charged with teaching the use of an incendiary device in violation of another federal statute, and all eight were charged with conspiracy among themselves and with others to commit offenses under these statutes. All eight stood trial,[2] except that a mistrial was declared, during the trial, as to Mr. Seale.[3] The appellants were each convicted on the respective substantive counts. Froines and Weiner were acquitted on the substantive count against them, and they and appellants were acquitted on the conspiracy count.

Dellinger, Davis and Hayden were associated with an organization called National Mobilization Committee to End the War in Vietnam (often referred to as "Mobe"). Hoffman and Rubin had organized, in late 1967, Youth International Party, Y.I.P. (often referred to as Yippie, or the Yippies).

---

1. 18 U.S.C. § 2101.

2. United States v. Seale, 461 F.2d 345 (7th Cir., 1972) and In re Dellinger, 461 F.2d 389 (7th Cir., 1972) involve contempt proceedings resulting from the same trial.

3. His case was severed, and later dismissed on motion of the government.

Mobe was an "umbrella" organization composed of various protest groups and its purpose was to sponsor demonstrations against the military activities of the United States in Vietnam, and racism, poverty, and injustice in the United States. Starting in early 1968, plans were formed for protest demonstrations in Chicago during the Democratic convention. Contact was made from time to time with Chicago city officials. David Dellinger was one of a number of co-chairmen of Mobe, others identified in the record being Professor Sidney Peck, Western Reserve University, Professor Donald Kalish, University of California at Los Angeles, Msgr. Charles O. Rice, Pittsburgh, and Rev. Ralph Abernathy, Southern Christian Leadership Conference, Atlanta. Rennie Davis, aged 28, was Mobe's Project Director for these activities and set up an office in Chicago.

Yippie was a less formal organization, under the leadership of Hoffman, Rubin and a number of others. One announced interest was to protest American conventional life style as well as military involvement in Vietnam. Yippie planned to hold a "Festival of Life" in Chicago parks during convention week. As expressed in one circular, the festival would be ". . . a six-day music-film-theatre-anti-draft youth festival which will express the new youth culture and will demonstrate to the world the continuing conflict between the life of youth and the death of the military-political system."

Although Mobe and Yippie were separate organizations, their leaders came together at several meetings early in 1968 where activity for convention week at Chicago was planned. There was a considerable degree of community of effort during the week itself.

The events which are of principal concern in this case occurred in the southern portion of Lincoln Park, and in and near Grant Park. Lincoln Park, in which Yippie held its festival, lies along Chicago's Lake Michigan shore, and extends northward from 1600 North. Grant Park is also on the lake front, and extends from about 100 North to 1200 South. Michigan Avenue runs north and south along the west edge of Grant Park, and the downtown "Loop" area of Chicago is west of Michigan. The Conrad Hilton Hotel was a focal point during convention week because of the significant individuals and party committees and groups residing and headquartered there. The Hilton is on the west side of Michigan Avenue, and extends from Balbo Avenue (or East 7th Street) at the north, to East 8th Street at the south. Convention sessions were held at the International Amphitheatre at 43rd and Halsted Streets, many blocks south and some blocks west of the Hilton, a little more than five miles away, over all. The Amphitheatre was the announced objective of a protest march which did not take place.

Count I of the indictment charged that defendants and others conspired not only to travel in and use the facilities of interstate commerce with the intent to incite, organize, promote and encourage a riot, but also to participate in and carry on a riot, to commit acts of violence in furtherance of a riot, and to aid and abet persons in such activities, as well as to commit offenses under 18 U.S.C. § 231 (a)(1) and (3).[4] It alleged a number of overt acts to effect the objects of the conspiracy besides the speeches alleged in the various substantive counts. By reason of the verdict of acquittal of Count I, we are no longer concerned with its allegations, nor with the proof offered thereunder, except as such proof tends to establish intent or some other requisite of the much more narrow substantive counts.

Each appellant was charged in one count with traveling in interstate com-

---

4. These offenses include teaching or demonstrating the use of incendiary devices with knowledge that they will be used in a civil disorder which may obstruct commerce, or interfering with a fireman or law enforcement officer engaged in his duties during such civil disorder.

merce from outside of Illinois to Chicago, with intent to incite, organize, promote and encourage a riot, and thereafter, on or about specified dates and at specified locations, with speaking "to an assemblage of persons for the purposes of inciting, organizing, promoting and encouraging a riot." The speech or speeches charged were, against Dellinger in Count II, August 28 at Grant Park; against Davis in Count III, August 1 at 30 West Chicago Avenue. August 9 at the Mobe office (407 S. Dearborn Street), August 18 at 1012 North Noble Street, and August 26 at Grant Park; against Hayden in Count IV, August 26 at Lincoln Park, and August 28 at Grant Park; against Hoffman in Count V, August 26 at Lincoln Park, August 27 at Lincoln Park, and August 29 at Grant Park; and against Rubin in Count IV, August 25 at Lincoln Park, August 26 at Lincoln Park, and August 27 at Lincoln Park.

Violent encounters between the city police and other persons occurred in and near Lincoln Park late in the nights of Sunday, Monday, and Tuesday, August 25, 26, and 27, after the police ordered the people in the park to leave in accordance with the 11:00 P.M. park closing ordinance. The other major violent incident occurred on the evening of Wednesday, August 28th on Michigan Avenue near the Hilton Hotel. The crowd involved there had come from an afternoon rally in Grant Park. The relevant events during the week are summarized as follows:

### Sunday, August 25:

The Yippies conducted a rock concert in the afternoon in Lincoln Park. Estimates of the number of people ran up to 4,000. There were two minor brushes with the police. During the afternoon Davis and Hayden led a march of several hundred to the Hilton, where a moving picket line was maintained without incident. About 9:00 P.M. there was a confrontation in Lincoln Park between a group of police officers and a group of other persons. The details are in conflict, but it appears that an exhortation by Rubin to attack the police was the basis for the August 25th speech charged against him in Count VI.

About 10:30 P.M., two police officers, assigned to follow Davis and Hayden, and who had followed them into Lincoln Park, discovered two men, allegedly Hayden and Wolfe Lowenthal, letting air out of the tires of the officers' car. A crowd gathered and the officers elected not to make an arrest at that time, but the arrest of Hayden was made the following afternoon.

Sometime after 11:00 P.M., the police announced that the park was closed. Later, a line of police officers moved from east to west through the park, forcing the remaining crowd out of the park. There was testimony that the police struck people with their nightsticks, both within and outside of the park.

### Monday, August 26:

After the arrest of Hayden, Davis led a protest march of about 1,000 people from Lincoln Park to the police station at 11th and State (two blocks west and three blocks south of the Hilton). After making various chants at the police station, the march proceeded east on 11th to Michigan Avenue and then north along the west edge of Grant Park. A block south of the Hilton, there is a little hill in the park, topped by an equestrian statue of John A. Logan, Civil War General and United States Senator from Illinois. The first Logan-statue-incident of the week occurred here. A number of marchers ran up the hill, and several climbed the statue. The extent of any violence does not very clearly appear from the testimony except that one young man who climbed the statue testified that his arm became wedged in some part of it and the police pulled on his legs until his arm broke. There is testimony that as the marchers were running up the hill, Davis was yelling on the loudspeaker to "Take the hill." Later when the police were directing people to come down, the testimony was that Davis yelled: "Don't let the pigs

take the hill." That appears to be the basis for the August 26th speech charged against Davis in Count III. Talks by Davis at earlier meetings in preparation for the events of convention week were the bases for the speeches charged against him on August 1, 9, and 18.

On Monday evening several thousand people gathered in Lincoln Park. Trash cans, park benches, and similar elements were formed into a barricade, apparently for the purpose of impeding the clearing of the park by police. After 11:00 P.M., and an announcement by the police that people should leave the park, tear gas was spread, and 200 to 300 policemen crossed the park, surmounted the barricade and expelled the crowd. There was testimony that people were clubbed by the police and that people assaulted police; that missiles were thrown at the police and police vehicles damaged; that the police used mace; pursued people in a several block area near the park, including some who had not been in the park.

There was testimony that on Monday, Hoffman and Rubin spoke to groups in Lincoln Park urging that the park be held. These apparently are the bases for the August 26th speeches charged against them in Counts V, and VI. The basis for the August 26th speech charged against Hayden in Count IV is not clearly identified.

*Tuesday, August 27:*

Early Tuesday evening there was a rally in Lincoln Park at which Rubin and Seale spoke. There was also disputed testimony of a talk by Hoffman to a group about 8:00 P.M. These talks were apparently the basis for the August 27th speeches charged against Rubin in Count VI and Hoffman in Count V.

At 8:30 P.M. a fund raising rally, termed an "unbirthday" party for President Johnson, was held in the Coliseum, one block west and seven south of the Hilton.

Later, in Lincoln Park, a number of clergymen, presumably in protest against the force used Sunday and Monday by the police, held a service in which about 1,000 people participated. Sometime after 11:00 P.M. the police moved on the crowd, dispensing tear gas. The crowd was expelled from the park, and there was testimony of beatings by police officers, assaults on the police, and commotion and violence in streets near the park for a substantial period.

Meanwhile several thousand persons gathered in the portion of Grant Park immediately east of Michigan Avenue, and opposite the Hilton. About 50 police officers were in a line along the east sidewalk. There was testimony that a few missiles were thrown and epithets shouted at the police. The police made no effort to expell the crowd from the park and the crowd remained several hours. They left after a speech by Hayden.

*Wednesday, August 28:*

Nomination of a candidate for President was scheduled for the convention on Wednesday. The city had granted Mobe a permit for a rally at the bandshell in Grant Park, although requests for a march to the Amphitheatre or a demonstration in its neighborhood had been denied or rebuffed. On Wednesday afternoon from about 2:30 P.M. to 5:00 P.M., 10,000 to 15,000 people attended a rally at the bandshell.

There were a number of speakers. Dellinger was master of ceremonies and his talks were the basis for the only speech charged against him in Count II. Hayden's speech near the end of the rally was apparently the basis for the August 28th speech charged against him in Count IV.

Police and National Guardsmen were on hand in Grant Park, and before the rally terminated virtually sealed off the park. One violent incident or confrontation occurred during the rally when an individual lowered the American flag on

a flagpole near the bandshell. He was arrested and there was testimony of violence between police and some of the members of the crowd in connection with that incident and in the area where it occurred. Dellinger from the platform urged the audience not to become involved, and there is testimony that some of the marshals recruited by Mobe made an effort to separate the crowd from the police. Davis was injured at about this time and went to a hospital. There is testimony of a police charge into the seated crowd.

Late in the rally, Dellinger announced that he would lead a non-violent march to the Amphitheatre, notwithstanding the lack of a permit. A large segment of the crowd (3,000 or more) formed ranks extending along Columbus Drive, a north-south drive in the park. The head of the march was to the north, near the intersection of Balbo as it crosses the park. The police did not allow the march to proceed, and it remained immobile and orderly for nearly an hour, while the leaders negotiated with police. The police offered to permit a march to one of several other destinations, but not to the Amphitheatre.

Approximately 6:30 to 7:00, Dellinger announced that the march would not occur, and the people began to leave. Parallel to Columbus Drive, and west of it, the depressed Illinois Central Railroad tracks run through the park. The tracks are crossed by bridges at Balbo (700,S.) Congress (500,S.) and Jackson (300,S.), and two pedestrian walkways. All bridges south of Jackson came to be sealed off by guardsmen, and tear gas was released at Columbus Drive and Congress. Most people crossed at Jackson, and moved south from there on Michigan.

There was some attempt to reform the march on Michigan, with the head end at about 10th Street, but the police stopped this and moved the people north. A very heavy concentration of people (several thousand) occupied the Balbo and Michigan intersection.

Deputy Superintendent of Police Rochford was in command of the police. He gave the order to clear the street. Arrests and battle between the police and crowd followed. There is, of course, conflict in the testimony (some of which comes from apparently disinterested people), but there were injuries and assaults on both sides. Superintendent Rochford, although indicating that he considered the crowd a vicious one, and presumably responsible for the injuries which occurred, admitted on cross-examination "As far as the police tactics, some officers went a little beyond what I expect them to do as professional police officers. That's a matter of fact. I am dissatisfied with that."

### Thursday, August 29:

In the afternoon, there was a rally in Grant Park addressed by a number of speakers, including Senator Eugene McCarthy and Mr. Dick Gregory. At one point it was announced that there would be a march to the Amphitheatre. A crowd of several thousand walked south on Michigan Avenue, but was stopped at 18th and Michigan by police, under command of Superintendent Rochford. After a few minutes, the crowd proceeded north on Michigan, with Rochford accompanying it. The second Logan-statue-incident occurred. Rochford ascended the hill and talked to the crowd, after which it dispersed and proceeded north to the Hilton area. Remarks allegedly made by Hoffman on this occasion, proposing the kidnapping of Rochford, were apparently the basis for the August 29th speech charged against him in Count V.

### The government theory of the facts:

There is in some instances conflict in the evidence as to what a defendant said or did, or whether the person who said or did something was properly identified as a defendant. On appellate consideration, we are required to resolve such conflicts in favor of sustaining the jury verdict and hence in favor of the government. In other areas, there is dis-

pute over the inferences which can properly be drawn, largely with respect to the intent with which a defendant traveled to Chicago or spoke or acted at the time of an alleged overt act. The sources of the inferences would be statements and plans before travel, acts and statements after arrival and during the convention, and retrospective statements afterward. We shall attempt to state, broadly, the government's theory with respect to intent.

Each defendant, it was contended, shared the common aim of producing violence during convention week in Chicago under circumstances where it would seem that the violence had been precipitated by the establishment and appear that the government was forced to destroy its own people in the streets in order to survive. Although that was the real purpose defendants allegedly had in mind, it was a purpose they could not afford to announce.

It was argued that defendants could succeed only if they could induce a large number of people to come to Chicago and be on hand to participate. Rubin and Hoffman used the plan of a Festival of Life and Davis, Dellinger, and Hayden used the idea of holding a "counter convention" to lure multitudes to Chicago to be organized and worked upon to produce a violent confrontation. Permits for use of parks must be sought in order to obtain performers as attractions for the crowd. Yet if permits were refused, ultimate success in producing violence would be more probable, and the total freedom from restraint announced for the festival rendered denial inevitable.

Mobe preparations included the recruitment and training of volunteer marshals, ostensibly to help maintain order among the thousands Mobe hoped to attract. But the government produced testimony that the marshals were trained in techniques for aggressive purposes.

As analyzed by the government, the defendants deemed it a wise tactic to start out on Sunday, August 25th, with orderly activity, and gradually to raise the pitch so as to get the crowd more excited and more involved in making trouble, but not so much as to have a mass arrest before Wednesday, when the big crowd was needed for the finale.

Hopefully the finale could occur Wednesday evening at the Amphitheatre, and Mobe sought permits to march to and demonstrate at that location. At the time of the nomination violence could be expected to erupt, or at least be easy to incite. Ideally, said the prosecutors, defendants wanted the world to see the government using troops to protect itself against protesting youngsters clamoring to enter or attacking and perhaps scaling the walls of the Amphitheatre.

The government pointed out that Mobe had obtained more than enough volunteer housing to accommodate all who actually came for both Mobe and Yippie activity, and that none needed to sleep in Lincoln Park. Several defendants urged people to stay there nevertheless, with knowledge that fighting would result when the police expelled the crowd. One or more defendants had promoted plans for activities which would divide the attention of police and for violent so-called mill-ins. Finally when it became apparent that a march to the Amphitheatre would be blocked, defendants called for a division of the crowd at the Wednesday afternoon rally, some appearing to march and occupying the police with that effort while others, operating in small groups, engaged in violent activity in various parts of the city.

As things turned out, the confrontation and battle took place at Michigan and Balbo. The government relies on subsequent statements made by several defendants about this event, and claims of victory, as proof of a long-abiding intent to cause violence.

*The defense theory of the facts:*

Defense counsel urged the jury to accept the defense version where testimony was in conflict. In particular they

urged disbelief of the several police witnesses who were attending meetings and events in an undercover role.

In addition, arguing against the inferences urged by the government, the defense contended that defendants' apparent intent, to demonstrate, to march, to organize peaceful activity, and to hold a contrasting festival of life, was their real intent; that it is ludicrous to believe that this was all a facade for the plan attributed to them by the government.

The defense produced a parade of well known witnesses, prominent in literature, music, and politics, some of them involved in Yippie and Mobe, and argued that all these people would have to have been duped by defendants if the government theory were true.

They argued the genuineness of their attempts to obtain permits and of their expressions of willingness to work out plans with city officials. They suggested that had permits been granted all would have proceeded peacefully even though with permits a much greater number of people would have come to Chicago.

It is the defense theory that the decisions to have the police actions of major consequence were unnecessary, and that the violence which did occur was the product of police aggression and excessive force.

The defense suggested that the city administration made unwise, and, indeed, unconstitutional, decisions to prevent mass demonstrations near the Amphitheatre in order to avoid embarrassment to the city as host and to the party, of which the mayor was a prominent leader, and chose to follow a hard line which, in the end, made inevitable the battle at Michigan and Balbo.

With reference to the city's last minute offer to permit a march to some point other than the Amphitheatre, the defense argued that was like telling the protesting patriots before the Boston Massacre, "Go anywhere you want, but don't go to the Custom House."

The broad issue of fact was whether the defendants intended only to engage in protected first amendment activity, or, at most, non-violent civil disobedience, or to cause violence. And secondarily, because of the basis for the federal criminal statute under which they were prosecuted, even if the defendants did by the time of convention week form an intent to cause violence, had this been their intent when they traveled to Chicago?

## I. IS THE ANTI-RIOT ACT UNCONSTITUTIONAL?

The constitutionality of 18 U.S.C. § 2101 has already been before this court. Plaintiffs in National Mobilization Comm. to End War in Viet Nam v. Foran,[5] including present defendants, sought to enjoin the presentation of evidence to a grand jury in order to obtain an indictment, arguing that the statute was unconstitutional on its face. The district court concluded that the constitutional questions raised by plaintiffs were not substantial and therefore dismissed the action rather than calling for the three-judge court which would have been required by 28 U.S.C. § 2282. We affirmed: "Our conclusion is that the plaintiffs' attack upon these statutes does not present a substantial constitutional question requiring the convening of a three-judge district court."

Defendants here make arguments, in part, which were not brought before us in *Foran*. Because of these added challenges, the fact that the statute has received only limited judicial treatment,[6] and because it operates in an

---

5. 411 F.2d 934 (7th Cir., 1969).

6. The only other direct analysis of § 2101 we find in In re Shead, 302 F.Supp. 560, 564 (N.D.Cal., 1969), aff'd on other grounds in Carter v. United States, 417 F.2d 384 (9th Cir., 1969), cert. den. 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807. Two other courts have cited *Foran's* conclusion with approval: Livingston v.

area where there is substantial potential for abridgment of expression, we have again given the statute careful consideration.[7] Although acknowledging substantial questions not identified or perceived when *Foran* was before us, we conclude that when, as we set out below, the statute is fairly read as a whole and all basic relations between elements are noted, the statute is not unconstitutional.

■ In every instance a statute must on its face be at least adequately complete and precise to give notice to reasonable men as to what conduct is prohibited.[8] That warning is at a basic level, setting out those elements and relationships which, when combined, bring one within the statute's scope. It reasonably reflects, but does not specify the precise standard of proof or degree of relation between those elements which will be imposed.[9]

■ But a statute's warning may extend too far—it may describe and give warning regarding conduct which can not constitutionally be penalized. The traditional and "restrained" approach when this occurs is to judge the statute in terms of the result worked by its application in the case before court.[10] in those instances, however, where statutes clearly warn that constitutionally protected expressive activity *will be,* or even, with some degree of vagueness, warn that such activity *may be* penalized, the courts have recognized a "chilling effect," or deterrence of protected expression which requires more drastic judicial treatment of the statute. While

Garmire, 437 F.2d 1050, 1053 (5th Cir., 1971), opinion withdrawn on rehearing, 442 F.2d 1322 (5th Cir., 1971), and Douglas v. Pitcher, 319 F.Supp. 706, 710 (E.D. La., 1970). *Foran* stressed the "express intent requirement" in upholding both the Anti-riot Act and 18 U.S.C. § 231(a)(1) and (3). This reliance was approved in United States v. Featherston, 461 F.2d 1119, 1121 (5th Cir., 1972), involving § 231(a).

7. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) was decided after this court's decision in *Foran*. Defendants suggest in their brief at p. 21 that "Until the Supreme Court spoke in *Brandenburg*, it was clearly arguable as the panel of this Court concluded in *Foran* and as the Supreme Court of Ohio found in *Brandenburg* itself, that *Whitney* [Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095], even though undermined and discredited over the years, cf. Dennis v. United States, 341 U.S. 494 at p. 504 [71 S.Ct. 857, 95 L.Ed. 1137] (1951), retained sufficient vitality to permit an advocacy statute to survive a facial attack and be constitutionally tested by subsequent standards of construction and application." We are not persuaded that this explanation can avoid the holding of *Foran*. As noted in *Brandenbury*, *Whitney* had already been thoroughly discredited. Nor is there any indication that this court in *Foran* relied on any residue in *Whitney*.

8. "A statute meets the standard of certainty required by the Constitution if its language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Turf Center, Inc. v. United States, 325 F.2d 793, 795 (9th Cir., 1964), citing United States v. Petrillo, 332 U.S. 1, 6, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).

9. Statutes must be recognized as frameworks for setting rights and liabilities and not as detailed descriptions for all time of all conduct upon which the statute will impose legal consequences. This framework concept is expressed by the Court in *Petrillo, supra* n. 8 at p. 7, 67 S.Ct. at 1542: "We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress."

An application of the concept is seen in Dennis v. United States, 341 U.S. 494, 515, 71 S.Ct. 857, 870, 95 L.Ed. 1137, when the Court states, "We see no difference, from the standpoint of vagueness, whether the standard of 'clear and present danger' is one contained in haec verba within the statute, or whether it is the judicial measure of constitutional applicability."

10. These distinctions are discussed at length in Note, "The First Amendment Overbreadth Doctrine," 83 Harv.L.Rev. 844 (1970).

this same deterrence from unpunishable conduct likely occurs from an overly broad statute dealing with any type of conduct, the high value attached to uninhibited expression, and the acknowledgment of its sensitive nature, have produced exceptions to the usual judicial attitude toward statutes questioned on constitutional grounds.

*First,* there is not a requirement that the person attacking the breadth of the statute demonstrate that his own conduct in issue and within the proscription of the statute could not constitutionally be regulated by a statute narrowly drawn—"By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, [the Court has] in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation." [11]

■ *Second,* although in the instances of statutes not infringing on first amendment areas a person who could show his conduct to be in an area of overbreadth would simply have vindicated his own case, a broader result may be required for first amendment over-breadth. In those instances of overbreadth where "no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution. . . .," [12] the whole statute must be declared a violation of the first amendment, and void for all applications.

■■ *Third,* in a first amendment case the range of construction to avoid overbreadth is significantly narrowed. For any statute, context of language and legislative history are the best guides to congressional purpose and the lengths to which Congress enacted a policy, and thus set the range of construction. Welsh v. United States, 398 U.S. 333, 347, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) [Mr. Justice Harlan concurring]. Within this range in non-first amendment cases there might additionally be said to be a presumption that the statute was meant to operate only within the limits of legislative power, and that becomes another component in interpretation. In first amendment cases that presumption is either greatly weakened or dropped.[13] If a clear meaning, without the presumption, cannot be determined, then the statute suffers the re-

11. Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

12. Id., p. 491, 85 S.Ct., p. 1123.

13. It is the preferred position of the first amendment which grounds this treatment. "In such instances [where legislation impinges on freedom of mind or conscience] to say that there is no presumption of constitutionality is simply to recognize in one way the preferred position of these freedoms. This is not to say, however, as Mr. Justice Frankfurter has feared, that there is a presumption that such legislation is unconstitutional. It is rather no more than a way of signaling the special importance to society of these rights and noting that they may not be regulated by showing a mere 'rational basis' for legislation." McKay, "The Preference for Freedom," 34 N.Y.U.L.Rev. at 1213. See also Cahn, "The Firstness of the First Amendment," 65 Yale L.J. 464 (1956).

This is most apparent in first amendment cases dealing with statutory vagueness. Thus in NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 337, 9 L.Ed. 2d 405, 417 (1963), the court made it clear that,

"If the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression."

We note the close relation of vagueness and overbreadth in first amendment cases, since a vague statute permits overly broad application to protected activity, Note, "The First Amendment Overbreadth Doctrine," Harv.L.Rev. 833, 872 [Sec. B. "The Vagueness of Overbroad Statutes"] (1970). With that similarity we find the reduced presumption against a construction which would render the statute invalid equally appropriate for overbreadth considerations.

lated weakness of vagueness and, if the functional conditions set out below are met, overbreadth.[14]

■ The doctrine of overbreadth applies when a statute lends itself to a substantial number of impermissible applications, such that it is capable of deterring protected conduct,[15] when the area affected by the challenged law substantially involves first amendment interests,[16] and when there is not a valid construction which avoids abridgment of first amendment interests.

With these considerations in mind, we proceed to consider the statute now involved.

[a] The Statute.

A concern of Congress in July 1967 and March 1968 was stopping riots. 18 U.S.C. ch. 102 was added by Pub.L. 90–284, 82 Stat. 75, enacted April 11, 1968. The chapter consists of two sections, 2101, "Riots", prescribing a penalty for certain activities, and 2102, "Definitions", defining certain terms used in § 2101. § 2101(a)(1) provides,

"Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—

(A) to incite a riot; or

(B) to organize, promote, encourage, participate in, or carry on a riot; or

(C) to commit any act of violence in furtherance of a riot; or

(D) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;

and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph—

Shall be fined not more than $10,000, or imprisoned not more than five years, or both."

§ 2102(a) defines the term "riot" to mean a public disturbance involving

"(1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual."

§ 2102(b) sets the threshold meaning for the intended results, referred to in § 2101(a)(1)(A) and (B):

"As used in this chapter, the term 'to incite a riot', or 'to organize, promote, encourage, participate in, or carry on a riot', includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the

---

14. Note, Harv.L.Rev. at 872.

15. Harv.L.Rev., *supra*, note 10, at 859, "A substantial overbreadth rule is implicit in the chilling effect rationale. . . . the presumption must be that only substantially overbroad laws set up the kind and degree of chill that is judicially cognizable." The argument is also made that "if a court were to strike a narrowly

focused law for the sake of dissipating its minimal chilling effect, the holding would effectively foreclose the field of legislation."

16. The Harvard article, *supra*, note 10, at 861, stresses, as we elaborate later, that this "area of impact" is to be found in the "effect rather than the language of a challenged law."

rightness of, or the right to commit, any such act or acts."

[b] Relation of First Amendment.

■ Ideally the analysis should begin with a delineation of the scope of speech [17] protected by the first amendment. Such delineation is difficult, for as each element is suggested, one's mind is flooded with illustrations which will not fit. Of course, on the one hand, protected "speech" is not limited to vocal, verbal, or art-form expression, and, on the other, there are myriad examples of everyday injurious activity directed or carried on by means of the spoken or written word which government has unquestioned power to regulate or forbid. All expression of ideas is effected by, or is, itself, conduct, and all conduct necessarily expresses some idea, emotion, or thought. Perhaps we can do no better than a generalization which equates first amendment "speech" with conduct which makes an offer in the market place of ideas. Indeed we need no more precise delineation for the purpose of considering the statute here, for it is clear that individual or group conduct for the dominant and virtually sole purpose of expressing views on public questions is well within the concept of speech protected by the first amendment.

■ The fact that conduct qua expression is "speech" does not mean that it can not at all be regulated or made a crime,[18] but does result in severe limitations on that process. The first amendment by its negative drafting ("Congress shall make no law . . . abridging the freedom of speech. . . .") protects conduct qua expression unless it can be removed from that protection pursuant to some doctrine ju-

dicially recognized as consistent with the first amendment. Thus, one who challenges the application of a statute to conduct which amounts to expression does not have the burden of bringing his expression within the first amendment. Rather the burden is on his opponent to show that such expression is within one of those narrow areas which by their relation to action partake of the essential qualities of action rather than expression and therefore are carved away from the first amendment.

■ As to any given statute then there is first the threshold question whether the statute relates to expression and is therefore governed by first amendment considerations. We look for that answer in reality and not solely in the words of the statute. Thus, if a statute in its impact has or can be expected substantially to involve expression, that must be sufficient, whether or not the words of the statute so provide. There is, secondly, the removal question, whether the expressive conduct is so related to action that the expression is therefore carved away from the protection of the first amendment.

■ As to the Anti-riot Act, the government at times argues that travel with intent and not expression is the "gravamen of the offense" and that, therefore, the doctrines of the first amendment are not relevant to our determination of constitutionality. We are unable to accept this argument. There would be most serious doubt whether an individual's travel with intent to do something inimical to the interests of the community, but without any step other than the individual travel being taken to effect the intent, could be made an offense.[19] Even if it could,

---

17. Although the first amendment protects freedom of assembly as well as freedom of expression, we think that a discussion of the statute with respect to its impact on speech will suffice. There appears no question of validity with respect to freedom of assembly which requires distinct consideration.

18. Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

19. The Mann Act, for example, requires transportation by the defendant of a woman or girl, as well as a specified intent. 18 U.S.C. § 2421. 18 U.S.C. § 1952 requires not only travel by a defendant with a specified intent, but also fulfillment or an attempt to fulfill such intent.

Congress has not done so here. We view the statutory element of interstate travel (or use of facilities), accompanied by the specified intent, as an element which Congress required as the foundation for its power to punish the conduct of inciting or participating in a riot. We consider the first amendment test to be applied to this federal statute the same as that which would have to be applied to a state statute, identical except not requiring interstate travel as an element of the offense.

■ A realistic approach compels application of a first amendment test to a statute which punishes activity leading up to and furthering a riot, for at least two reasons. One is that rioting, in history and by nature, almost invariably occurs as an expression of political, social, or economic reactions, if not ideas. The rioting assemblage is usually protesting the policies of a government, an employer, or some other institution, or the social fabric in general, as was probably the case in the riots of 1967 and 1968 which are the backdrop for this legislation. A second reason is that a riot may well erupt out of an originally peaceful demonstration which many participants intended to maintain as such. Each participant is entitled to a careful distinction between responsibility for the lawful and constitutionally protected demonstration and responsibility for the activity for which the legislative body validly prescribes a penalty.

In many of its provisions (incite, organize, promote, encourage) the anti-riot statute relates to persons causing the possibility that others will riot, and makes those persons liable because of their causal rather than active role. It is by expression, in whatever form, that causation adequate to bring on punishment must be most likely to occur.[20] As examples only, but certainly very relevant examples, the counts against the five defendants here charged with inciting, organizing, promoting and encouraging a riot under this statute, were based wholly on the making of speeches.

[c]　Removal of expression from First Amendment Protection.

■ For our purposes the most fundamental principle guarding against removal from first amendment protection is that the removed expression must have a very substantial capacity to propel action, or some similarly entwining relationship with it.[21] This requirement is at the heart of the clear and present danger test enunciated by Mr. Justice Brandeis in Whitney v. California.[22] It is implicit in the distinction in Yates v.

---

20. Note, "The Overbreadth Doctrine," 83 Harv.L.Rev. 844, 861–862 (1970) : "Incitement to riot, for example, is not itself an activity normally thought to be within the protection of the Constitution, and an incitement law may be 'general' in phraseology. Still, an incitement offense may often occur in the context of speechmaking and propagandizing activities that clearly bear first amendment interests. Similarly, laws prohibiting disorderly conduct often affect the conduct of protest demonstrators. The subject matter test should be flexible in operation. Depending upon the times and the evolution of social practices for bringing viewpoints before the public, laws punishing flag burning or mutilation of draft cards may or may not have first amendment subject matters."

21. See Emerson, Toward a General Theory of the First Amendment (1966), pp. 59–62. Although the author follows the procedure of separating "conduct" into "expression," which is always protected and "action" which is subject to regulation, he points out that there are "mixed cases" which fall on the "action" side of the line. "Expression often takes place in a context of action, or is closely linked with it, or is equivalent in its impact. In these mixed cases it is necessary to decide, however artificial the distinction may appear to be, whether the conduct is to be classified as one or the other. This judgment must be guided by consideration of whether the conduct partakes of the essential qualities of expression or action. In the main this is a question of whether the harm attributable to the conduct is immediate and instantaneous, and whether it is irremediable except by punishing and thereby preventing the conduct."

22. 274 U.S. 357, 372, 47 S.Ct. 641, 71 L. Ed. 1095 (1927) (concurring opinion).

United States,[23] between advocacy to do something and advocacy to believe in something. It is the essence of the dual requirement in Brandenburg v. Ohio,[24] that before advocacy of the use of force of law violation can be proscribed it must be shown (1) that "such advocacy is directed to inciting or producing *imminent* lawless action" and (2) that such advocacy "is *likely* to incite or produce such action."[25]

■ The first amendment is premised upon the value of unfettered speech.[26] Constitutional protection is clearly not to be limited, therefore, to mild or innocuous presentation, and it is unrewarding to search for a formula describing punishable advocacy of violence in terms of fervor or vigor. The real question is whether particular speech is intended to and has such capacity to propel action that it is reasonable to treat such speech as action.

The test for the attributes which speech in favor of violent action must achieve before it may be classified as action and thus removed from first amendment protection has been variously phrased—clear and present danger—directed to inciting and likely to incite imminent lawless action—whether the harm sought by expression is immediate and instantaneous and irremediable except by punishing the expression and thereby preventing the conduct—whether the expression is inseparably locked with action.

Our question, in examining the validity of the Anti-riot Act on its face is whether, properly construed, it punishes speech only when a sufficiently close relationship between such speech and violent action is found to exist. Semantically the cases suggest that while a statutory prohibition of advocacy of violence is overbroad, since protected speech is included within advocacy, a prohibition of intentional incitement of violence is not overbroad.[27] The latter depends upon a construction of "incitement" which is sufficiently likely to propel the violent action to be identified with action.

We consider the statute as a whole in determining whether §§ 2101 and 2102 require the relation between expression and action necessary to avoid first amendment protection.

■ The base concept of the statute is "riot." Although there is much to be said in favor of a definition of "riot"

23. 354 U.S. 298, 325, 77 S.Ct. 1064, 1080, 1 L.Ed.2d 1356, 1378 (1957).

24. 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

25. For a discussion of the *Brandenburg* requirements in a prior restraint context see Collin v. Chicago Park District, 460 F.2d 746, 753 (7th Cir., 1972).

26. Mr. Justice Holmes, dissenting in Abrams v. United States, 250 U.S. 616, 630, 631, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919), describes the system and its function: ". . . when men have realized that time has upset many fighting faiths, they may come to believe ever more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expressions of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country. . . . Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrant making any exception to the sweeping command, 'Congress shall make no law . . . abridging the freedom of speech.'"

27. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

requiring a larger assemblage threatening greater public danger [28] we are unable to conclude that Congress in § 2102(a) [29] has not described a disorder of a type which is enough of an assault on the property and personal safety interests of the community so that participation in a riot or *intentionally and successfully causing* a riot can be made a criminal offense.[30]

■ There is, however, no requirement in §§ 2101 and 2102 that the riot as defined in § 2102(a) occur. Rather there are listed in § 2101(a)(1) four categories.

"(A) to incite a riot; or

(B) to organize, promote, encourage, participate in, or carry on a riot; or

(C) to commit any act of violence in furtherance of a riot; or

(D) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot."

One of these categories must be specifically intended at the time of travel, and one of them must be the purpose for which the required overt act is done or attempted.

Assuming that the overt act required by the statute must itself be a fulfillment of one of the elements listed in (A)-(D) (and not merely a step toward one such element), then our question is whether one could ever be convicted under the statute, reasonably construed, for a speech which fulfilled one of these elements without being sufficiently

closely related as a propelling cause of a riot.

(C) itself requires action. (D) requires aiding and abetting another in participating in or carrying on, under (B), and thus could occur only if action occurred, or in inciting, under (A), and thus there would have to exist the same relationship to action as would be required for incitement.

The argument might be developed that while to "incite," "participate in," "carry on," and "aid or abet" any of the foregoing all embody a relation to action in that they logically appear to require that the riot occur, at least to the extent specified in § 2102(a)(2), or, with respect to incitement, require the element of propelling the action, that does not so clearly appear with respect to "to organize, promote, encourage," and that a less close and perhaps insufficient relationship is required as to them. We note, however, that all elements of (A) and (B) are treated alike in § 2102(b), and each "includes, but is not limited to, urging or instigating other persons to riot." We think the more natural construction is that all the terms are on an equal footing with respect to the degree of causal relationship required.

■ A further argument might be made that "urge," under some of its dictionary definitions, *e. g.*, "solicit or entreat earnestly" might mean little more than an effort at persuasion, unrelated to its potential for or success in producing the desired action.

We conclude, however, that in this statute "urge" does embody the required relation of expression to action—(i)

---

28. For example, the definition provided in the proposed draft of the federal criminal code defines riot to mean "a public disturbance involving an assemblage of five [ten] or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs law enforcement or other government function." Proposed New Federal Criminal Code, Title 18, U.S.C. § 1801.

29. *Supra*, p. 357.

■

30. The current District of Columbia riot statute, as analyzed in United States v. Jeffries, 45 F.R.D. 110 (D.C., D.C., 1969)', requires that the defined public disturbance occur. See especially Appendix A, 45 F.R.D. at 118, which sets out the charge to the jury of the essential elements which the Government must prove beyond a reasonable doubt. The riot act proposed by the Attorney General in 1968 also required the riot to occur, Congressional Record for March 5, 1968, Vol. 114 at 5213.

Nearly all definitions suggest an impelling beyond mere persuasion, and it is said that "URGE indicates a pressing, impelling, seeking to influence, or overcoming some obstacle, check, or drawback to a certain course." [31] (ii) The use of the term in other statutes has been taken to embody a relation to action. Street v. New York, 394 U.S. 576, 591, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). (iii) Unless we conclude that the phrase following completely changes its meaning,[32] the exclusion in § 2102(b) of "the mere oral or written (1) advocacy of ideas or (2) expressions of belief . . ." can be taken to indicate an awareness by the drafters of the necessity of avoiding categories which do not relate to action. It seems to us that the threshold definition of all categories as "urging or instigating" puts a sufficient gloss of propulsion on the expression described that it can be carved away from the comprehensive protection of the first amendment's guarantee of freedom of speech.

If we could be persuaded that the overt act "for any purpose specified in subparagprah (A), (B), (C), or (D) of this paragraph" could be a speech which only was a step toward one of the elements of (A)-(D), taking those merely as goals, we would be unable to conclude that the statute required an adequate relation between such speech and action. We think the phrase "for any purpose specified" is amenable to either meaning, i. e., (A)-(D) as goals or (A)-(D) as the overt acts. We find what we consider an adequate and uncontradicted answer in § 2101(b) which refers to "one or more of the overt acts described in subparagraph (A), (B), (C), or (D) of paragraph (1) of subsection (a). . . ." Reading "overt act for any purpose specified" as equivalent to fulfillment of any purpose specified in (A)-(D) leaves the statute with an adequate relation between expression and action as described in the preceding step.

The conclusion that the statute adequately establishes the required relation to action which can be made illegal disposes as well of defendants' argument that the statute infringes on the fundamental constitutional right to travel. The existence of that relationship narrows the imposition on travel to instances adequately involving a purpose which the government may counter. Aptheker v. Secretary of State, 378 U.S. 500, 511, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

We do not pretend to minimize the first amendment problems presented on the face of this statute. In one hypothetical application, the statute could result in punishment of one who, having traveled interstate, or used the mail, with intent to promote a riot, attempted to make a speech or circulate a handbill for the purpose of encouraging three people to riot. Arguably the statute does not require that the speech, if made, or the handbill, if circulated, succeed in any substantial degree in encouraging the audience to riot. Arguably a frustrated attempt to speak or circulate would not achieve the constitutionally essential relationship with action in any event. Arguably the statute does not require that a speech or handbill succeed in producing a riot or bringing the persons addressed to the brink of a riot, prevented only by some intervening and superseding force, and arguably no less degree of propelling of action by speech or handbill will suffice, even though intent to succeed must also be proved. Although we reject these arguments, in part as constructions of the statute, and in part as grounds for declaring it void, we acknowledge the case is close.

There is an additional attack, based on a particular phrase in § 2102(b). The contention is that by reason of this phrase in definition, § 2101

---

31. Webster's Third New International Dictionary (1961).

32. See discussion, *infra*, this page.

expressly forbids a segment of protected expression, mere advocacy of violence without propelling such action. The whole problem, which we shall term the "double negative," is created by the last phrase (which we have here italicized) of § 2102(b):

"As used in this chapter, the term 'to incite a riot', or 'to organize, promote, encourage, participate in, or carry on a riot', includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, *not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.*"

A true negation of a negation is an affirmation, and a careful exclusion from an exclusion is at least likely to result in an inclusion. If the statute provides punishment for *mere* oral or written advocacy of an act of violence or assertion of the rightness of an act of violence, established principles already referred to would require that it be declared void. Thus, the italicized phrase creates a serious problem which was not presented to nor considered by either the district court or this court in *Foran.*

The legislative history gives no help in identifying the intent with which the challenged phrase was added. It does show warnings offered, during the period the matter was under consideration, that mere advocacy, even of unlawful conduct, could not constitutionally be forbidden. If we were to conclude that the drafters of the double negative intended to make mere advocacy an offense, we would have to believe they did so in the face of warning that so providing would render the statute invalid.

The structure of the statute as a whole likewise gives little aid. The government calls the phrase "awkward phraseology" meant to exclude the described advocacy, not from the preceding exclusion, but from the terms being defined. This explanation assumes the drafters meant a repetition since exclusions (1) and (2) would have sufficed. The defendants point to the phrasing as evidence of the vindictive intent of the drafters. Their explanation fails to recognize that it is likely that exclusions (1) and (2) were unnecessary and show only an abundance of caution, as does § 2101(e) excluding travel for the purpose of pursuing the legitimate objectives of organized labor through orderly and lawful means. If so, an exclusion from (1) and (2) should not be read to change the intent of the statute which precedes exclusions (1) and (2).

Another approach is to assume that the drafters of this phrase realized that a truly inciting, action-propelling speech will include advocacy of acts of violence and assertion of the rightness of such acts, and intended that the challenged phrase forestall any claim by such speaker that in that context such advocacy and assertion constitute mere advocacy of ideas or expression of belief excluded under (1) and (2). There is still, in this construction, some awkwardness and an assumption that unnecessary language was employed, but under all the circumstances, including the relationship of this phrase to the other parts of the statute, we deem it the most reasonable construction.

We are aware of the sensitivity with which a court must undertake construction of a portion of a statute against a claim that, properly construed, such portion creates first amendment overbreadth. Possibility of prosecution for protected conduct under a vague statute which arguably may cover it is itself an element of overbreadth.

"Even if it can be said that a conviction for falsely taking this oath would not be sustained, the possibility of a prosecution cannot be gainsaid. . . . 'It is not the penalty itself that is invalid, but the exaction of obedience to a rule or standard that is so vague and indefinite as to be really no rule or standard at all.'" Baggett v. Bullitt, 377 U.S. 360, 374, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964).

"So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression. A Quantity of Copies of Books v. [State of] Kansas, 378 U.S. 205 [84 S.Ct. 1723, 12 L.Ed.2d 809]; Bantam Books, Inc. v. Sullivan, 372 U.S. 58 [83 S.Ct. 631, 9 L.Ed.2d 584]; Marcus v. Search Warrant[s of Property, etc.], 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127]; Speiser v. Randall, supra [357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460]. Since § 364(4) is so intimately bound up with a definition invalid under the reasoning of Baggett v. Bullitt, we hold that it is invalid for the same reasons." Dombrowski v. Pfister, 380 U.S. 479, 494, 85 S.Ct. 1116, 1125, 14 L.Ed.2d 22 (1965).

We consider any possibility that prosecution would be undertaken in reliance on defendants' proffered construction of the challenged phrase as minimal. Bearing in mind the purpose served by the overbreadth doctrine, to avoid the chilling of free speech, we consider it unreal, as well, to suppose that the existence of this obtuse and obscure provision will deter expression. The problem now raised escaped recognition in *Foran* by the then attorney for the present defendants, by the district court, and by this court.

Accordingly we conclude that the presence of the challenged phrase does not amount to overbreadth.

## II. ADEQUACY OF INDICTMENT.

■ Defendants challenged the indictment for failure to state an offense and also sought a bill of particulars. Each count charged a particular defendant with travelling during a period of time in interstate commerce from outside Illinois to Chicago, "with intent to incite, organize, promote and encourage a riot" and that on or about a specified date at a specified location in Chicago "he did speak to [an] assemblage[s] of persons for the purposes of inciting, organizing, promoting and encouraging a riot;" in violation of 18 U.S.C. § 2101.

We conclude that each count adequately stated an offense.[33] To the extent that there was any uncertainty as to which of two or more speeches given the same day at the same location would be relied on, a bill of particulars may have been appropriate. As will be seen, we have decided to reverse for trial error and abuse of discretion. The first trial, together with our discussions in this opinion, has supplied whatever identification of particular speeches might be required to avoid surprise at a new trial if the government elects to proceed.

We acknowledge some attractiveness in an argument that in an indictment charging an inciting speech as an offense, first amendment considerations require greater specificity than is found in this indictment. A grand jury may be less likely to indict merely for the expression of extreme views if forced to set out at least the substance of the statement and the circumstances giving reason to believe the statement had the capacity to propel unlawful action. The resulting process of analysis would be an additional prophylactic against prosecution for protected expression.[34] We are not, however, persuaded that there is real need for a departure from the usual principles applicable to the sufficiency of indictments.

## III. VALIDITY OF INDICTMENT: JURY SELECTION.

Defendants moved to dismiss the indictment on the ground the grand jury was improperly selected. They later challenged the array of petit jurors on the same ground. In view of our decision with respect to trial error, we are

---

33. Defendants have not argued that the counts which charge more than one speech are duplicitous.

34. See comments on protective function of grand jury. Branzburg v. Hayes, 408 U.S. 665, 686, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

directly concerned only with the challenge to the grand jury and the indictment.

Defendants attack the use of lists of voters (registered or actual) as the source from which names in the master jury wheel are, in effect, randomly drawn, arguing that this "results in the disproportionate exclusion of blacks, the mobile, youth and the politically alienated, as these classes are most likely to be members of the disenfranchised populace."

The indictment was returned after December 22, 1968, the effective date of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–71. The grand jury had been empaneled before the effective date, at a time, however, when voter registration lists were the source of 97% of the names of prospective jurors. The act, § 1861, declares the general policy that litigants "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes," and, § 1862, forbids exclusion on several specified grounds. It also provides, § 1863(b)(2), that each jury plan shall, in addition to registration or actual voter lists, "prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862."

To the extent defendants claim substantial failure to comply with the jury act, their motion is subject to a period of limitations prescribed by § 1867(a) —"before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." It appears to be conceded that defendants' motion came too late under this statutory provision. Hence their claims

must be tested by constitutional standards independently of whether or not the act seeks a more perfect cross section than the constitution itself requires as a minimum.

This court has held that a system of grand jury selection using only voter lists as sources of names is permissible.[35]

When the voter lists are the only source of names, it is obvious that the system "excludes" residents qualified for jury service but who are not qualified or do not choose to vote. Defendants suggest that the persons so "excluded" constitute a class of the politically alienated. An infinite number of political attitudes and inclinations go into the phenomenon of non-participation in the electoral process. It is not clear that the attitudes relevant to the grand jury function which might be characteristic of political alienation are not also held by many persons who do choose to vote. We do not think that providing the label "politically alienated" creates a cognizable group that is being excluded from jury service.[36]

It does appear, generally, that a lower percentage of some of the younger age groups register to vote, compared with the percentage of some of the older age groups who register.[37] At the time the prospective jurors were selected for the grand jury in this case, persons aged 18 to 21 were not qualified to vote.

It would follow that if there are attitudes relevant to the grand jury function which are characteristic of the underrepresented or excluded age groups and different from those characteristic of the older age groups, exclusive use of voter lists as the source of random selection will make it less probable that those attitudes will be represented, or proportionally represented, on any particular grand jury. And there are many attitudes toward life and government in

---

35. United States v. Gast, 457 F.2d 141 (7th Cir., 1972). See cases cited, p. 142.

36. See United States v. Kroncke, 321 F. Supp. 913, 914 (D.Minn., 1970).

37. See analysis of the problem in Judge Doyle's opinion in United States v. Gargan, 314 F.Supp. 414, 416 (W.D.Wis., 1970), affirmed in *Gast, supra* fn. 35.

which it is commonly thought that younger people generally differ from older people.

Feasibility makes reliance on voter lists attractive. They contain a large if not precisely perfect sample of the qualified residents of an area, reflecting all the varying attitudes relevant to the grand jury function which such residents hold. Among persons qualified to vote, and absent discriminatory practices in administering the election system, not demonstrated here, the voter list is open as a matter of choice. The choice of the voter list as the source of names for jury selection is surely not invidious discrimination, except where the list itself reflects discriminatory practices.

We view the underrepresentation on voter lists of younger residents, and thus of any relevant attitudes which may be more prevalent among younger than older residents, as reason why it is desirable to seek feasible ways to supplement the voter list, but we are not prepared to say that the use of the voter list per se results in distortion of a perfect cross section sufficient to render an indictment constitutionally invalid.

## IV. VOIR DIRE EXAMINATION.

One of the paths to the impartial jury guaranteed by the sixth amendment is the voir dire examination. Defendants seek reversal on the ground that the voir dire examination was inadequate. This claim has two branches. The first is that the voir dire was so "perfunctory" with respect to attitude that it failed to provide a basis for defendants' challenges, both for cause and peremptory. The second is that the court similarly failed to inquire about any effect of pretrial publicity.

### A. *Juror Attitudes.*

The voir dire examination took a little over a day. Pursuant to Rule 24(a) F. R.Cr.P., the district judge conducted the examination, after having solicited proposed questions from the parties. He asked the entire group of veniremen the following questions: whether the prospective jurors were acquainted with employees of the FBI, or of the Justice Department; whether they were acquainted with defendants, their counsel, or their associates; whether they could agree to follow the law as given to them; whether they could keep an open mind until time to reach a verdict; whether they could treat the testimony of a government agent the same as that of any other witness; whether prior jury service would prevent them from being impartial; and whether there was any reason they could not be fair and impartial jurors in this case. Fifty-six veniremen stated without explanation that they could not be impartial and were excused by agreement of the parties. Two others who said they could not be impartial for a particular reason were also excused.

The jury box was filled and the court questioned the first 12 individually. The court asked standard questions, primarily relating to marital and family status, occupation of prospective juror and spouse, employer and length of employment of prospective juror and spouse, number of children, their schools and occupations.

Two veniremen who said they worked for the federal government were asked whether being a government employee would influence their judgment. Another was asked, "Do you feel that the fact that your father is a member of the Chicago Police Force and has been for many years would affect your judgment as a juror if you were selected in this case?" All said they could still be impartial.

After interviewing each of these first 12, the court inquired of the group whether any had close relatives or friends who were employed by any law enforcement agency or other agency of the local, state or federal government. When five answered yes, the court asked each whether this would influence his judgment. All answered that it would

not. The court did not ask this question of the succeeding veniremen who entered the jury box.

Defense counsel repeated defendants' request that the judge ask the questions they had submitted. The court responded, "I have reached the conclusion that those I haven't asked are not germane to the issues presented here by the indictment and the pleas of not guilty thereto."

The jury was selected after 24 persons had been individually questioned, the defense had exercised 10 of their 17 peremptory challenges,[38] and the government two. Appellants accepted the tendered jury but "under the greatest of protest" because the court had not asked questions they considered necessary for fully exercising their challenges.

In order to sustain their present contention, it is not necessary for defendants to show that members of the jury were in fact prejudiced. The focus is exclusively on whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present. We recognize that there is no generally accepted formula for determining the appropriate breadth and depth of the voir dire, except that the court's discretion is "subject to the essential demands of fairness." Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931).

We start with the exclusion of jurors for cause, where actual bias is admitted or presumed. The Supreme Court has said that " . . . the trial court has a serious duty to determine the question of actual bias," Dennis v. United States,

339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950), and that "[a]ll persons otherwise qualified for jury service are subject to examination as to actual bias." United States v. Wood, 299 U.S. 123, 133, 57 S.Ct. 177, 179, 81 L.Ed. 78 (1936). Jury service by a person with actual bias in a particular case would violate the right to an impartial jury.

Subsidiary to challenge for cause is the peremptory challenge where bias is suspected or implied. It is exercised "on grounds normally thought irrelevant to legal proceedings" such as "the race, religion, nationality, occupation or affiliations of people summoned for jury duty," appearance, association, and the like, and it is "exercised without a reason stated, without inquiry and without being subject to the court's control." Swain v. Alabama, 380 U.S. 202, 220, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965).

The government argues that the court is obligated to inquire only into matters that would disqualify the juror for cause, and that the court's first group of questions were adequate to produce disclosure of any relevant prejudice. We disagree. The government's position must rest upon an assumption that a general question to the group whether there is any reason they could not be fair and impartial can be relied on to produce a disclosure of any disqualifying state of mind. We do not believe that a prospective juror is so alert to his own prejudices. Thus it is essential to explore the backgrounds and attitudes of the jurors to some extent in order to discover actual bias, or cause. See Kiernan v. Van Schaik, 347 F.2d 775, 779 (3d Cir., 1965).[39]

---

38. Rule 24(b), F.R.Cr.P., provides the defense with 10 peremptory challenges. In a trial of more than one defendant, the court may allow additional challenges. The trial court in this case allowed one additional challenge for each additional defendant, for a total of 17.

Four alternate jurors were also selected. Rule 24(c) provides two peremptory challenges if 3 or 4 alternates are selected. The defense exercised both. One of the alternates later became a juror when another juror was excused as a result of her expression of inability to be impartial after being shown a letter sent to her home.

39. "Jurors are drawn from the general body of the community for a short term of service, . . . and then return to their customary occupations with neither training nor traditions of impartiality. They must often be unaware of their own disqualification in specific cases . . . ."

But beyond this, an answer which falls short of an admission of bias may nevertheless aid counsel in deciding to exercise a peremptory challenge. The Supreme Court has stated that the peremptory challenge, although not required in the Constitution,[40] is "one of the most important of the rights secured to the accused," and that "[t]he denial or impairment of the right is reversible error without a showing of prejudice." Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965). The peremptory challenge is provided in the federal system by Rule 24(b), F.R.Cr.P.

If this right is not to be an empty one, the defendants must, upon request, be permitted sufficient inquiry into the background and attitudes of the jurors to enable them to exercise intelligently their peremptory challenges, Cf. United States v. Esquer, 459 F.2d 431, 434 (7th Cir., 1972); United States v. Lewin, 467 F.2d 1132 (7th Cir., 1972); Spells v. United States, 263 F.2d 609, 611 (5th Cir.), cert. denied, 360 U.S. 920, 79 S.Ct. 1439, 3 L.Ed.2d 1535 (1959).

■■■ The government is correct that collateral or unrelated issues should not be raised. United States v. Daily, 139 F.2d 7 (7th Cir., 1943). But this does not mean that all questions must relate directly to the indictment or pleas in the case. Some questions may appear tangential to the trial but are actually so integral to the citizen juror's view of the case, especially one with publicly controversial issues, that they must be explored. For example, in *Daily, id.*, this court acknowledged the right of a defendant of the Jehovah's Witness faith to a limited inquiry into the jurors' prejudice against Jehovah's Witnesses, even though his religious faith was not an issue before the court. Similarly, in United States v. Clancy, 276

F.2d 617, 632 (7th Cir., 1960), rev'd on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), a case in which the defendants were tried for evasion of wagering taxes, we found no error in the district court's refusal to ask questions tendered by defendants, but we noted that the trial court had substituted two questions "designed to uncover prejudice against gamblers and religious scruples against gambling." At a minimum, when requested by counsel, inquiry must be made into matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury.[41]

■■■ What these essential inquiries are, of course, varies with each case. Many elements of this case might have aroused the jurors' prejudices. One of the central themes was the protest against this nation's involvement in war in Vietnam. Defendants were leaders in such protest and claimed that their militancy did not go beyond constitutionally protected bounds. There were and are deep divisions in our society resulting from that war, gravely illustrated by this unprecedented confrontation at the convention of a major political party in 1968. Anti-war activists, such as these defendants, have over the last decade challenged the validity of a concept of patriotism that requires young people, sons of people who might be akin to prospective jurors, to die for country in a war they consider mistaken, and immoral. We do not believe that the court could safely assume, without inquiry, that the veniremen had no serious prejudice on this subject, or could recognize such prejudices and lay them aside.

In evaluating this topic, it is important to recall the time when this trial occurred, and to recognize that the division in public attitudes toward the Viet-

---

40. Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919).

41. The government suggests that the court's instructions during the voir dire and throughout the trial created an atmosphere of impartiality and reinforced

the voir dire. Certainly there are situations where instructions to an impanelled jury would cure weaknesses in the voir dire. But they can never be a substitute for essential inquiries into the areas of seemingly probable prejudice of the veniremen.

nam war has changed and is changing still. The extent of unpopularity of the war in 1972, when this opinion is written, is not a fair index of the probable opinions on that subject in a cross section selected in September, 1969. Perspective is important. These defendants' plans for activities in Chicago in August, 1968 were first formed when President Johnson was expected to be a candidate to succeed himself. He withdrew March 31, 1968. The 1968 candidacies of Senators Eugene McCarthy and Robert Kennedy, the latter assassinated in June, 1968, were associated with anti-war sentiment. Further crystallization of anti-war sentiment is associated with the Cambodian venture and the Kent State killings, both in the spring of 1970. These episodes had not yet occurred when the jury was selected for this trial in September, 1969. We have no doubt that defendants brought to trial in 1969 upon charges that their anti-war activities were carried beyond constitutional protection were entitled to a testing of their jurors for biased attitudes on this subject.

Perhaps secondary, but significant, were the conflicts of values represented by the so-called youth culture—hippies, yippies and freaks—in contrast with the more traditional values of the vast majority of the community, presumably including most citizens summoned for jury service. Again, we are not unaware that many otherwise qualified members of the community could not be impartial toward, and in fact are often offended by, persons who wear long hair, beards, and bizarre clothing and who seem to avoid the burdens and responsibilities of regular employment. Several defendants would exemplify this conflict.

A similar conflict of values was symbolized in the confrontation between the city police and the demonstrators. A juror's basic sympathies with the actors in these events could easily impair his ability to consider alternative views of the case as presented in court. A venireman's relationship with law enforcement officers would be an important factor to be inquired about in evaluating his ability to be an impartial juror.

In our view, some minimal inquiry into at least these three basic areas was essential to a fair trial of this extraordinary case, at least when defendants requested such inquiry. We have pointed out the inadequacy of a general question in testing a juror's possible prejudice in a specific area where it may well exist. United States v. Robinson, 466 F.2d 780, p. 782 (7th Cir., 1972); United States v. Lewin, 467 F.2d 1132, pp. 1137, 1138 (7th Cir., 1972).

Comparison of the questions the court did ask will illustrate our point. The district court asked approximately ten general questions of the entire venire, which appear to have probed attitudes and associations, answers to which could have led to a challenge for cause in any given case. Many veniremen were dismissed as a result of answers to those questions. The more specific questions to individual jurors touched primarily family and employment status, with an occasional question whether a particular fact, primarily government employment, would prevent the persons from being impartial. By and large, they were neutral questions, the answers to which were not probative of actual or suspected prejudice.

The only question that could be said to relate peculiarly to the case before the court was the one addressed to the first 12 interviewed:

> "I would ask each and every one of the prospective jurors in the jury box . . . whether you have any close relatives or friends who are employed by any law enforcement agency or other agency of the local, State or Federal Government."

Of those who responded affirmatively, the court asked whether that would influence their judgment, and all answered that it would not. But since this was not asked again, only four of those who served on the jury were subjected to this inquiry.

■ However satisfactory this limited examination might be in some trials,[42] under the circumstances of this case, the court's severe restriction of the voir dire may well have curtailed defendants' challenges for cause and failed to provide them with reasonable guidance in exercising peremptory challenges.

Government counsel submitted a list of requested questions, some of which were asked at least in substance, by the district judge. Other questions requested by the government, but not asked, inquired whether the prospective juror had read about, or was downtown in Chicago during, the Democratic national convention; whether he knew anyone who participated in protest demonstrations then, or at any other time, or whether he himself had participated in a protest demonstration; whether he had ever had an unpleasant experience with law enforcement officers.

Defense counsel submitted a list of 44 questions. Some raised inappropriate subjects of inquiry and few were properly phrased even where the subject was appropriate. Some of the questions, however, would have elicited a prospective juror's attitude toward dissent, and public protest against the Vietnam war; toward long hair, beards, unorthodox clothing, and life styles differing from his own; and toward policemen and law enforcement.

We do not suggest that the court was obligated to ask all the often propagandistic questions in the form submitted by defendants. But their request raised a judicial duty "to do what was reasonably practicable to enable the accused to have the benefit of the right of peremptory challenge or to prevent unfairness in the trial." Bailey v. United States, 53 F.2d 982, 984 (5th Cir., 1931); cf. United States v. Mattin, 419 F.2d 1086 (8th Cir., 1970).

B. *Pretrial Publicity.*

The disorders from which this case arose generated world-wide publicity. There was frequent and continuing local press coverage.

In March and April of 1968 the Chicago media covered meetings of "radical" leaders who were planning protest activity at the convention. Names of certain leaders, including defendants Davis, Dellinger, Hayden, Hoffman and Rubin, began to appear, and it was announced that the Chicago police department had assigned policemen to "tail" certain of these leaders on a 24-hour basis.

In July and August, the media carried copious accounts of the security measures being taken in anticipation of violent demonstrations, for example, installation of barbed wire fences near the Amphitheatre, activation of the national guard, and provision of special court accommodations for an overflow of arrestees. Defendants Davis, Dellinger, Hayden, Hoffman and Rubin, again, were identified as leaders of various groups at which the security measures were directed.

Publicity peaked during convention week. The media published all shades of opinion, ranging from those which blamed the violence on "terrorists" and "outside agitators," to those blaming it on the city administration's "gestapo tactics." A substantial part of the evidence at trial consisted of news films, parts of which had been shown on television at the time of the events in August, 1968.

42. One of the district judge's comments at the hearing in November, 1970, concerning communications between the judge and the deliberating jury (see Part V) indicates that he limits voir dire as a practice:

"I restrict voir dire of prospective jurors very carefully. I think there is more time wasted in many American courts on voir dire than for any reason I know of."

We are sympathetic with the district judge's view, but expedition is clearly subsidiary to the duty to impanel an impartial jury. See Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 409, 465–467 (1960).

In September, 1968, the federal grand jury began its investigation and the city administration released its account of the disorders, Strategy of Confrontation. October brought hearings before the House Un-American Activities Committee. December continued news coverage with the release of the Walker Report, a federally commissioned investigation.[43]

The articles before the court show that from December 1968 through March 1969 the press engaged in much speculation about the grand jury's continuing investigation and the anticipated indictments. Publicity rose again when the jury returned its indictments on March 20, when, of course, all these defendants, who had often been linked with the disorders, were clearly identified with the coming prosecution.

Because the articles were presented to the district court on May 9, 1969, the record contains little of the press coverage after that time, but it does appear that the arraignment on April 9 as well as the arrest of defendant Seale in August in connection with Connecticut charges of murder and conspiracy were other matters that brought the case and the defendants again into the public view. The jury was selected in September, 1969.

On May 9, 1969 defendants moved for a continuance until July, 1970 because of pretrial publicity. With the motion they presented to the court over 200 pages of newspaper articles (upon which the above summary is based) related to the convention disorders, its aftermath of investigations, reports and hearings, and the indictments of the eight defendants. The court denied the motion. On August 27, 1969, defendants again moved for continuance because of contemporaneous publicity concerning defendant Seale's arrest. In denying the latter motion the court said that a careful voir dire examination was the proper procedure for safeguarding against prejudicial publicity.

In anticipation of the publicity issue in the voir dire defendants moved for nine additional peremptory challenges for each defendant [44] and for questioning each venireman out of the presence of the others.[45] Both requests were denied and the examination took place as described in Part A above.

After the government tendered the panel, but before the defense began exercising peremptories, defendants made a motion to reopen the voir dire "to include questions . . . concerning the exposure of the veniremen to press,

---

**43.** Report of the National Commission on the Causes and Prevention of Violence, Chicago Study Team, Daniel Walker, Director, Rights in Conflict: Chicago's Seven Brutal Days (1968).

**44.** As it happened defendants did not exhaust their peremptory challenges, and we do not know whether or not they would have done so if prospective jurors had been questioned in the areas here discussed. We need not pass upon their claim for additional challenges, although noting that in United States v. Hoffa, 367 F.2d 698, 710 (7th Cir., 1966), vacated on other grounds, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967), a case attracting much publicity, this court rejected claimed error based on an allegedly insufficient number of peremptory challenges. Cf. United States v. Shaffer, 291 F.2d 689, 695 (7th Cir., 1961) cert. denied 368 U.S. 915, 82 S.Ct. 192, 7 L.Ed.2d 130 (1961).

**45.** This court has not required that jurors be individually questioned about exposure to pretrial publicity, e. g., United States v. Cook, 432 F.2d 1093 (7th Cir., 1970) cert. denied 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971), in contrast to such requirement where there has been exposure to publicity during trial. Margoles v. United States, 407 F.2d 727 (7th Cir., 1969) cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). See, however, the recommendation, A.B.A. Standards Relating to Fair Trial and Free Press § 3.4 (Approved Draft, 1968), cited with approval by the Committee on the Operation of the Jury System, Judicial Conference of the United States, 45 F.R.D. 391, 413 (1968); see Silverthorne v. United States, 400 F.2d 627, 639 (9th Cir., 1968); Patriarca v. United States, 402 F.2d 314, 318 (1st Cir., 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

radio & TV reporting concerning the facts surrounding this case." The court denied the motion on the grounds that it had asked a general question of the entire venire about whether they could be impartial. This question was,

"I ask you, ladies and gentlemen of the jury, whether there is any reason you can think of now, that would lead you to feel that if you are selected by the lawyers as jurors in this case, you could not be fair and impartial in this case, giving the United States of America, Mr. David T. Dellinger, Mr. Rennard C. Davis, Mr. Thomas E. Hayden, Mr. Abbott H. Hoffman, Mr. Jerry C. Rubin, Mr. Lee Weiner, Mr. John R. Froines and Mr. Bobby G. Seale a fair and impartial trial?"

It should be noted that the court had, at the beginning of the voir dire, gone over the indictment. Count I, the conspiracy count referred to many of the facts in the background of the charges, so that the prospective jurors may well have recognized that the case involved episodes in August, 1968, news of which they had seen or heard.

Defendants claim that the district court breached its duty to protect them from prejudice by reason of pretrial publicity. They claim error in the voir dire as well as in the court's failure to grant a continuance to protect against prejudicial publicity.[46] They maintain that the general question on voir dire of whether there was any reason the jurors could not be impartial was insufficient to probe the pretrial publicity issue, and that combined with the denial of their various motions, defendants received no protection from "the barrage of prejudicial pretrial publicity" that surrounded this case and the events from which it arose.

The government argues that the general impartiality question was adequate to evoke the response of persons who had formed an opinion of the case as a result of pretrial publicity. This method also prevented the veniremen from being "reinfected" with the publicity by stirring up their memories of these events in the presence of one another.

Even if the voir dire might have been handled differently, the government argues that defendants waived the issue. They point to defendants' failure to ask for a continuance on the eve of trial, or to move for a change of venue. Further, at the impanelling of the jury, defendants failed to submit proposed voir dire questions relating to publicity, declined to exercise all their peremptory challenges, and did not request inquiry into pretrial publicity until after the government had tendered the panel, which the government says was too late. Government counsel interpret this conduct as a "nefarious attempt to inject error into the record." Or at least, they argue, the court has no duty to concern itself with pretrial publicity if the parties do not request it, so defendants must accept the unfavorable consequences of their chosen course of action. They rely on United States v. Cook, 432 F.2d 1093, 1101–1102 (7th Cir., 1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971).

■ Taking first the question of whether defendants waived this issue, we reject the government's view. Since the district court had denied several motions for continuance, two of which related to pretrial publicity, a motion for continuance on the eve of trial may well have been futile, and failure to make it should not prejudice defendants in seeking the protection which would be afforded by an adequate voir dire. The same should be true with respect to their election not to seek a change of venue.

■ Further, we can not accept the argument that the failure to exercise all peremptory challenges precludes a finding that the voir dire was inadequate in the area of publicity. The less defendants knew about the jurors' impressions

---

46. We do not reach the continuance issue since it could not arise in the same manner on retrial.

from and reactions to what they had read, the less basis they had for exercising their quota of challenges. United States v. Shaffer,[47] is readily distinguishable, most obviously because in *Shaffer* the veniremen were specifically questioned regarding pretrial publicity and defendants' failure to exercise peremptory challenges indicated acceptance of the jurors in spite of prior knowledge of the case.[48]

■ Finally, we can only speculate as to why defendants did not submit questions concerning pretrial publicity, or why they did not object to the lack of questioning until the government had tendered the panel. We do know from the record, however, that when the district court denied a motion for continuance on account of prejudicial publicity, it represented that it would inquire into pretrial publicity on the voir dire:

"I was saying the proper procedure to safeguard against prejudicial publicity is to carefully examine prospective jurors on voir dire and I assure counsel for all parties that my voir dire will not only be comprehensive in itself but . . . I invite counsel for all defendants and counsel for the government to submit in writing suggested questions to be put to the veniremen. . . .

"Voir dire is an effective and practical method of resolving on a factual basis the otherwise debatable speculative question whether a fair and impartial jury can be selected. Upon the

voir dire, it can be determined whether prospective jurors read any articles dealing with these defendants, and, if so, whether these prospective jurors could remain impartial. . . . "

This assurance may well have lulled defense counsel into omission of questions of their own on this subject. Even if the court was not required to go into the subject in the absence of a request, albeit recognizing its importance, we see no reason why the court could not have reopened voir dire for this purpose when the matter was brought to its attention. Indeed, the court's stated reason for denying the motion was not untimeliness, but rather that it considered the subject to have been covered.

Most of the prejudicial pretrial publicity cases that have been before the Supreme Court have been attacks on state convictions in highly publicized cases. These appear to be cases of high sensationalism where the Court has granted certiorari to explore the minimal protections required by the due process clause.[49] See, e. g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Rideau v. Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L.Ed.2d 663 (1963).

The situation most nearly comparable to this one in terms of extent of publicity, though the type of activity is very different, is found in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751

47. 291 F.2d 689, 694–695 (7th Cir., 1961).

48. Cf. Delaney v. United States, 199 F.2d 107, 116 (1st Cir., 1952).

49. See Mr. Justice Frankfurter, concurring, in Irvin v. Dowd, 366 U.S. 717, 730, 81 S.Ct. 1639, 1646, 6 L.Ed.2d 751 (1961):
"Not a Term passes without this Court being importuned to review convictions, had in States throughout the country, in which substantial claims are made that a jury trial has been distorted because of inflammatory newspaper accounts . . . exerting pressures upon

potential jurors before trial and even during the course of trial, thereby making it extremely difficult, if not impossible, to secure a jury capable of taking in, free of prepossessions, evidence submitted in open court. . . . For one reason or another this Court does not undertake to review all such envenomed state prosecutions. But, again and again, such disregard of fundamental fairness is so flagrant that the Court is compelled . . . to reverse a conviction in which prejudicial newspaper intrusion has poisoned the outcome."

(1961).[50] *Irvin* was a habeas corpus proceeding brought to test the validity of Irvin's murder conviction and death sentence in a state court. For six or seven months preceding the trial, newspaper, radio, and television publicity about Irvin's unsavory past and the crimes he had allegedly committed saturated the area of Indiana in which the trial took place. The Court found "clear and convincing" evidence from the publicity itself that there was "deep and bitter prejudice" in the community. But it went on to make an independent examination of the voir dire transcript in order to determine whether the pretrial publicity, in fact, had prejudicially infected the persons summoned for services as jurors in the case. Since two-thirds of the jurors admitted that they had formed an opinion that the defendant was guilty, some also admitting their difficulty in laying aside their opinions, the Court held the conviction void.

The Court similarly analyzed both the publicity and the voir dire transcript in Beck v. Washington, 369 U.S. 541, 82 S. Ct. 955, 8 L.Ed.2d 98 (1961). The petitioner was one of several persons convicted of crimes growing out of scandals in the West Coast Teamsters Union. He argued that the adverse pretrial publicity prevented the selection of both a fair grand jury and a fair petit jury. Regarding the petit jury, the Court found

that "[a]lthough there was some adverse publicity [in the relevant period] . . . it was neither intensive nor extensive." Id. at 556, 82 S.Ct. at 963. But even though it did not find the "deep and bitter prejudice" of *Irvin*, the Court went on to examine the voir dire transcript and found to its satisfaction that everyone who served on the jury demonstrated that he could lay aside any opinions of the case he might have drawn from pretrial publicity.

■ These cases demonstrate the danger that widespread publicity about highly dramatic events will render prospective jurors incapable of impartial consideration of the evidence. We think it must follow that where pretrial publicity is of a character and extent to raise a real probability that veniremen have heard and formed opinions about the events relevant to a case, and at least where, as here, the defense has brought the pretrial publicity to the court's attention and requested voir dire inquiry, the court must make inquiry adequate to determine whether anyone has read or heard about the facts, and, if so, what the impact has been on his ability to serve as an impartial juror.[51] We agree with the Court of Appeals for the Ninth Circuit, which in Silverthorne v. United States, 400 F.2d 627, 637–638 (1968), said,

> "Therefore, when pretrial publicity is great, the trial judge must exercise

---

50. More extreme cases are Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *Rideau* the Court held that the pretrial publicity alone, principally a televised confession, was so prejudicial that due process could not be afforded by a jury drawn from the locality of the crime. In *Sheppard*, the Court found the pretrial publicity alone did not foreclose a fair trial, but that the impact on the community was so great that the totality of circumstances, including the trial court's failure to take strong measures to prevent the media's unprecedented intrusion into the trial, created what amounted to a presumption that the jury were infected with bias. See id. at 354ff, 86 S.Ct. 1507. The pub-

licity in the instant case was not comparable with the journalistic witch-hunts of *Rideau* and *Sheppard*. This jury was sequestered during almost the entire trial and there is no allegation that publicity during the trial was a factor in creating jury prejudice.

51. We are not persuaded by the government's argument that the publicity was on balance favorable to the accused so that defendants could not have been prejudiced by it. Widespread publicity about a controversial event, even though in part sympathetic with participants who are allegedly criminally responsible, is a signal to the court that the prospective jurors must be questioned to see whether these particular jurors are bringing abiding notions of guilt or innocence into the courtroom.

correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused. The judge must insure that the voir dire examination of the jurors affords a fair determination that no prejudice has been fostered. . . . He must determine whether 'the nature and strength of the opinion formed [if any] are such as in law necessarily raise the presumption of partiality.' " Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244 (1878).

■ That the publicity surrounding the instant case was tremendous cannot seriously be questioned. Although we do not perceive the "deep and bitter prejudice" in the community that was present in *Irvin,* we are certain that the publicity could well have had a prejudicial impact on the persons summoned for jury service. Even the government concedes the possibility that the veniremen had formed opinions before they entered the courtroom. Under these circumstances, we must conclude that the court had a duty to inquire into pretrial publicity on voir dire.[52]

Despite the district court's earlier assurance that the voir dire would cover pretrial publicity, the only explicit reference to publicity was to that which might occur during the trial. The court's only reference to pretrial publicity occurred when, in response to defendants' request to reopen the voir dire, it said that it had covered pretrial publicity in its general inquiry into whether there was any reason the veniremen could not be fair and impartial.

This broad question was not expressly pointed at impressions a juror may have gained from reading or hearing about the relevant events. Natural human pride would suggest a negative answer to whether there was a reason the juror could not be fair and impartial. A juror might well answer negatively in good faith, without stopping to consider the significance or firmness of impressions

he might have gained from news reports. We think the question is not adequate to bring out responses showing that jurors had gained information and formed opinions about relevant matters in issue if in truth any had. This broad question should not be relied on in a situation where there is a probability of exposure. In contrast, in all the Supreme Court cases mentioned above, the trial court inquired specifically into pretrial publicity. See Irvin v. Dowd, 366 U.S. 717, 727–728, 81 S.Ct. 1639, 6 L. Ed.2d 751 (1961); Beck v. Washington, 369 U.S. 541, 556–557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Sheppard v. Maxwell, 384 U.S. 333, 354, n.9, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966).

We find no decision of this court considering a claim that this type of general question is adequate to explore the impact of pretrial publicity. In Margoles v. United States, 407 F.2d 727 (7th Cir., 1969) cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), this court examined the voir dire transcript and found that the district court alerted the veniremen to their possible exposure to pretrial publicity, and then asked:

"If, as the result of newspaper reports, radio or television broadcasts, or conversations with others, you . . . formed any opinion or expressed any opinion whatsoever regarding the guilt or innocence of the defendant, . . . you should so indicate."

When some responded that they had read or heard about the case, the court inquired further to determine whether they could be impartial.

In United States v. Cook, 432 F.2d 1093 (7th Cir., 1970) cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971), this court did not detail the conduct of the voir dire. However, by referring to its brief in *Cook* which sets out passages from the voir dire transcript, the government in the instant

---

52. Cf. United States v. Lewin, 467 F.2d 1132, p. 1139 (7th Cir., 1972).

case establishes that the veniremen there were asked if they had heard about the case.[53] Specific questioning with respect to pretrial publicity or prior knowledge of the case occurred in United States v. Shaffer, 291 F.2d 689 (7th Cir., 1961) cert. denied, 368 U.S. 915, 82 S.Ct. 192, 7 L.Ed.2d 130 (1961), and Allen v. United States, 4 F.2d 688 (7th Cir., 1924).[54] That the prospective jurors in the above cases were explicitly asked about prior knowledge of the case is not an inconsequential distinction. It makes the crucial difference of the prospective jurors being alerted to the problem of pretrial publicity in evaluating their own fitness to serve as jurors.

The two cases seemingly closest to the situation before us are Silverthorne v. United States, 400 F.2d 627 (9th Cir., 1968), and Patriarca v. United States, 402 F.2d 314 (1st Cir., 1968) cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). In *Silverthorne*, the court reversed a conviction where, unlike the instant case, the prospective jurors were asked if they had heard anything about the case, but the court "made no effort to ascertain what information the jurors had accumulated and, consequently, had no way of objectively assessing

the impact caused by this pretrial knowledge on the juror's impartiality." 400 F.2d at 638. In *Patriarca*, the trial court asked a question substantially identical to the one asked here. Unlike this case, however, the trial judge informed counsel of the question he planned to ask and counsel responded that it was "fine." Because "the court did all that was requested," the appellate court did not reverse, but it criticized that question as being ill-directed at the issue of publicity:

"We feel bound to concede that such a single question posed to the panel en bloc, with an absence of response, achieves little or nothing by way of identifying, weighing, or removing any prejudice from prior publicity." [55]

■ Finally, contrary to the government's argument, it is undoubtedly possible to question the prospective jurors about pretrial publicity without exposing other members of the venire to the publicity. The procedure of individual questioning recommended by the American Bar Association, Standards Relating to Fair Trial and Free Press § 3.4 (Approved Draft, 1968), is of course one method. But even without individual

---

53. *Cook* is also different from the instant case in that in *Cook*, of four veniremen who admitted they had heard about the case, defense counsel questioned only one of them. Thus the government could validly argue that "[t]he defendant cannot be heard to complain of the inadequacy of the interrogation of the jury panel. . . ."

54. Another pretrial publicity case arising in this circuit is United States v. Hoffa, 367 F.2d 698 (7th Cir., 1966), vacated and remanded on other grounds, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967). Our opinion does not make clear what questions, if any, were asked. But the court did indicate that the voir dire met the requirements of Irvin v. Dowd and that the "transcript of the proceedings extending over a two weeks' period is convincing that the jurors selected were not prejudiced by publicity. . . ." Id. at 711.

The government also relies on United States v. Dennis, 183 F.2d 201 (2d Cir., 1950), aff'd on other grounds, 341 U.S.

494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), where appellants argued that "heated public feeling against Communists" prevented impanelling an impartial jury. We first note that *Dennis* was not an attack on the court's methods of protection against pretrial publicity. This was a problem with "general feelings prevalent in the society." The court distinguished the publicity situation by saying, "it was not as though [the prejudice against Communists] were temporary, so that there was any hope that with a reasonable continuance it would fade." Id. at 226.

The government quotes the court's statement, "If trial by jury is not to break down by its own weight, it is not feasible to probe more than the upper levels of a juror's mind." Id. at 227. But we note that the court's concept of the upper levels of the mind was not an endorsement of excluding all but the most general questions. The trial court had in fact asked several questions pertaining to prejudice against Communists.

55. 402 F.2d at 318.

questioning, the court could probe the impact of pretrial publicity without requiring the veniremen to describe what they had heard.

We have considered other arguments pertaining to the voir dire examination and have found them to be without merit or of insufficient importance to discuss here.

We conclude that the failure to inquire into the effect of pretrial publicity upon the jurors was error.

## V. COMMUNICATIONS BY THE TRIAL JUDGE AND MARSHAL WITH THE DELIBERATING JURY.

Several months after the verdict defendants discovered through a magazine article about the jury in this case that there had been communications between the district judge and jury during its deliberations without knowledge of counsel. Defendants then asked this court for a hearing at which the jurors and the deputy marshals who had been in charge of the jury during its deliberations could be interviewed regarding external pressures on the jury.

This court remanded for a hearing in district court to record the facts of such communications, if any, and any communications by officers in charge of the jury which may arguably have interfered with the jurors' exercise of impartial judgment. Our order also provided that "[t]he district judge may if he desires incorporate into the record his own recollections of the events relating to such communications, if any."

A hearing was held. Despite inevitable differences of memory because of elapsed time (February to November) the testimony of the jurors and marshals and the supplemental statement of the judge verified the report that communications had occurred. There appear to have been at least one, and probably two, notes to the judge that the jurors were unable to agree on a verdict and one note asking for "transcripts,"

apparently of speeches made by one or more defendants.

The deliberations began before noon on Saturday, February 14, 1970, and ended Wednesday morning, February 18, when a verdict was returned finding all seven who were then defendants not guilty of conspiracy, and finding the five present defendants guilty of the respective substantive counts. The messages, most witnesses agreed, were handwritten on a piece of paper and transmitted to the judge through the marshal. Eight jurors remembered at least one message telling the judge that the jury was unable to reach a verdict. Four believed this note was sent on Sunday; two thought it had been sent on Monday, one on the "very first day," Saturday, and one on either the first or second day of deliberations. Four had no recollection of this message.

Three jurors also remembered a second note that they were unable to reach a verdict, which they agreed was sent on Monday. Thus five jurors remembered a Monday note and four a Sunday note.

Eight jurors remembered a message to the judge requesting certain portions of the transcript. Three jurors thought this message was sent on Sunday, one on Monday, one on Tuesday, and three could not recall which day it was sent. Four jurors had no recollection of this message.

Deputy Marshal Dobroski was the only marshal who remembered any communications between the judge and jury. He testified that he delivered a note to the judge on Saturday, four or five hours after the jury had begun to deliberate. In response to this note the judge said, "Mr. Marshal, instruct the jury to continue deliberating." Marshal Dobroski further testified that he delivered a second note on Monday morning, to which the judge responded, "You will instruct the jury that I deny their application for transcripts."

The district judge, in his supplement to the record, recalled a Saturday mes-

sage "near the dinner hour on the first day" that the jury "could not reach an agreement," and a message "the next day, Sunday, February 15, . . . that the jury was unable to agree on a verdict or verdicts but that the jury was desirous of having me send to the jury room a transcript or transcripts . . . of evidence admitted during the trial."

There were various versions of the responses, orally conveyed by Deputy Dobroski or one other marshal, but the witnesses tended to agree that the response to the "hung jury" message or messages was that they were to continue deliberating, and the response to their request for transcripts was that it was denied.

There was also testimony to support defendants' allegation that a marshal volunteered comments to the jury during its deliberations. Five jurors testified that they remembered the marshal saying something to the effect of, "The judge can keep you here as long as he wants." Four jurors remembered the marshal making a statement that the jury in the *Krebiozen* case [56] had deliberated for an extraordinarily long time. Four jurors testified that they remembered the marshal saying something like, "Remember the judge's instructions." One or two jurors also testified that the marshal said, "This is your duty;" and

"It's been a long trial, you can't expect to come to a verdict so soon." Marshal Dobroski denied making any of these statements.

Defendants argue that the judge committed error by failing to make a record of the exchanges between the judge and jury, as well as in responding without affording counsel an opportunity to participate in formulating a response. They also argue that the marshal's remarks were an interference with the deliberations that deprived them of an impartial jury.

■ Counsel has a right as a general proposition to assume that any communication to the jury, bearing upon the case, will take place in open court.[57] Lapses should be closely scrutinized, although they may be excused or tolerated when it appears with certainty that no harm has been done.[58] The present case is not one in which a judge gave additional substantive instructions to the jury without notice to counsel, for which the federal courts have consistently reversed.[59]

Messages, conveyed through a marshal, that the jury should continue deliberations, have been held harmless error.[60] There are instances of out of court communication of information in documentary or other unequivocal form also found to be harmless error.[61]

56. United States v. Durovic, No. 64 CR 668 (N.D.Ill., 1966), was the celebrated trial before the same judge concerning allegedly fraudulent practices connected with the sale of the "anti-cancer" drug Krebiozen. See United States v. Bukowski, 435 F.2d 1094 (7th Cir., 1970).

57. Shields v. United States, 273 U.S. 583, 588, 47 S.Ct. 478, 71 L.Ed. 787 (1927).

58. United States v. Compagna, 146 F.2d 524, 528 (2d Cir., 1944).

59. See, e. g., Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 81, 39 S.Ct. 435, 63 L. Ed. 853 (1919) ; Shields v. United States, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927) ; Gagliardo v. United States, 366 F.2d 720 (9th Cir., 1966) ; Ah Fook Chang v. United States, 91 F.2d 805 (9th Cir., 1937) ; Chicago, R. I. and Pacific R. R. Co. v. Speth, 404 F.2d 291 (8th Cir.,

1968) ; Rice v. United States, 356 F.2d 709 (8th Cir., 1966) ; Gomila v. United States, 146 F.2d 372 (5th Cir., 1944) ; Arrington v. Robertson, 114 F.2d 821 (3d Cir., 1940) ; United States v. Schor, 418 F.2d 26 (2d Cir., 1969) ; Jones v. United States, 113 U.S.App.D.C. 352, 308 F.2d 307 (1962). But see McClain v. Swenson, 435 F.2d 327 (8th Cir., 1970) (court held presumption of error overcome by clear indication of lack of prejudice).

60. United States v. DiPietto, 396 F.2d 283, 287 (7th Cir., 1968) ; Walsh v. United States, 371 F.2d 135 (9th Cir., 1967) ; United States v. Grosso, 358 F.2d 154 (3d Cir., 1966).

61. Ferrari v. United States, 244 F.2d 132 (9th Cir., 1957), denial of request to hear a recording; Outlaw v. United States, 81 F.2d 805 (5th Cir., 1936), copy of instruc-

The nature of the out of court communications in this case is similar to those which have been held harmless, as above noted. There are several reasons, however, why we are unable to say with certainty that they were harmless in this case.

There are other courses which the judge might well have followed when the jury's notes were presented to him; he might have called the jury into open court and there given an appropriate response to the message; he might have discussed the message and possible response with counsel in the presence of defendants but in the absence of the jury and then made a response; he might have sent a message to the jury, preferably in writing, and made a record in open court at the earliest reasonable opportunity,[62] perhaps when there was still time for counsel to argue in favor of a supplemental response.

Even the last of those alternatives would have minimized the problem of fading recollection as to what occurred. There would have been less, or perhaps no, doubt as to the nature of the jury's request or the response actually transmitted. The judge has explained that he did not choose the first alternative because he concluded that if the jury were returned to the courtroom, there was very substantial danger of exposure to prejudicial statements, disruption, or violence. He recalled that there had been attempts of persons in the courtroom to influence the jury by disruptions and improper statements to jurors, and that hostility had been intensified after submission of the case to the jury and during the contempt proceedings on Saturday, February 14 and Sunday, February 15.[63] The judge offered no explanation for not following either of the other alternatives, except that relaying messages through the marshal is a longtime practice of all the judges in that district court.

There would have been no apparent inconvenience in promptly making the matter known to counsel and defendants. Counsel were in court during the contempt proceedings, and presumably close at hand until the verdict was returned on Wednesday, February 18. The defendants were in jail during those days except when they were in court.

After return of the verdict, Mr. Kunstler, of defense counsel, asked leave to interview the jurors, noting that the verdict might represent a compromise. On February 20, calling attention to news reports of interviews with jurors who stated that the verdict was a compromise, he renewed his motion. Leave was denied on both occasions. Without intimating any criticism of the district court's strong policy against permitting the parties to interview jurors, we point out that when the question was raised that the jurors may have compromised in order to be permitted to go home after four months sequestration, it would clearly have been appropriate for the judge to record what he knew about the messages asserting inability to agree.

We are not prepared to resolve the conflict in testimony and make a finding whether or not a marshal made the remarks attributed to either of them by some jurors, and suggesting the jury might be sequestered for a substantial further period before the judge would accept the fact of a hung jury. Had the messages and responses come to light more promptly the issue could probably have been resolved with greater certainty.

tions; United States v. Compagna, *supra*, note 58, judge personally told jury its request to hear testimony would be granted; United States v. Arriagada, 451 F.2d 487, 488 (4th Cir., 1971). See, however, reversal in Little v. United States, 73 F.2d 861 (10th Cir., 1934), stenographer sent into jury room to read requested material.

62. See United States v. DiPietto, *supra*, n. 60.

63. These contempt proceedings are the subject of In re Dellinger, 461 F.2d 389 (7th Cir., 1972).

It happens in this case that the suggestion that the verdict was the result of compromise between some who may have desired to acquit entirely and some who may have desired to convict entirely is plausible. It is indeed difficult to suggest an analysis of the evidence in this particular case which would support conviction of all five defendants on the substantive counts which would not lead equally to a conviction on the conspiracy count. It is true that the "hung jury" messages arrived within a few hours or a day or two of submission to the jury. These jurors had been sequestered for over four months and notwithstanding their duty not to discuss the case until submission, it is not really surprising that they discerned each other's views very rapidly. It is also true that the verdict of acquittal of conspiracy and conviction on the substantive counts came within two days, at most, of the second "hung jury" message.

■ If the judge had promptly brought the messages to the attention of counsel and the defendants, some other course of action might well have been chosen. Counsel might have persuaded the judge to summon the jury and give the kind of instruction called for by this court's decision in United States v. Brown,[64] asserting, among other things, that no juror should surrender his honest conviction for the mere purpose of returning a verdict. It is not perfectly clear what transcripts of speeches the jury desired to see, but interpretation of various speeches in evidence had an important bearing on the case, either as alleged overt acts or as to the intent of a particular defendant. Although action on a jury's request for a transcript of certain evidence is within the discretion of the judge,[65] the suggestions of counsel might well have been helpful and led to a different exercise of discretion.

Under the circumstances related, we are unable to find with certainty that these out of court communications were harmless, and therefore conclude they are grounds for reversal. See United States v. Glick, 463 F.2d 491 (2d Cir., 1972).

## VI. SELF-SERVING DECLARATIONS

Central issues at trial were the intent of each defendant at the time of his interstate travel to Chicago and at the time of his alleged overt acts. In each instance a defendant's presence in Chicago and participation in some aspects of the activity during convention week were the culmination of a plan he developed over a period of months. Each defendant sought to interest other people in coming to Chicago and joining in planned activity. As a result, evidence of plans, motive, and intent at a number of times during a period of months was relevant and not deemed too remote.

■ The government offered evidence of statements made by defendants before interstate travel, after arrival in Chicago and up to the time of the overt acts, and after the overt acts. When offered by the government, and relevant to intent, they were properly received as admissions, although those made prior to the overt acts may also have been evidence of state of mind at the time the statement was made, and therefore probative of intent at the time of travel or the time of the overt act, or, under the Verbal Acts doctrine, as supplying the significance of conduct contemporaneous with the statement, the conduct in itself being probative of intent at the time of travel or of the overt act.

The defense also offered evidence of statements made by defendants describing their plans for convention week activity. The court usually admitted testimony, either by a defendant or other witness, of oral statements of a defendant, but sustained objections to written statements, a distinction we find difficult to understand where the circumstances were otherwise comparable.

---

64. 411 F.2d 930, 933 (7th Cir., 1969).

65. United States v. DePalma, 414 F.2d 394, 396 (9th Cir., 1969).

Examples of excluded written statements are:

Defendants' Exhibit 235 was a document, titled "Movement Campaign 1968: An Election Year Offensive." It was written by defendants Davis and Hayden, and some 150 copies were distributed to people representing various organizations and assembled at the so-called Lake Villa conference of March 22 to 24, 1968. This conference was shown to be an organizational gathering and a stage in the development of plans for the convention week activity. The document had 21 pages, announced a proposal of "an election year program of organizing and protest against the failure of the government, particularly the failure of the governing Democratic Party" in seeking "an end to the Vietnam war, liberation from racism, and new steps toward a more humane society." Various plans of organizational activity, local and nationwide, were set forth, and several pages were devoted to activity in Chicago during convention week. One portion, with the subtitle "On Disruption in Chicago" argued that activity at convention time must, in order to be effective, be "nonviolent and legal."

Defendants' Exhibit 225 was an issue of "The Realist Magazine" containing an article by defendant Hoffman on plans for Yippie in Chicago.

Defendants' Exhibit 279 was a memorandum prepared under defendant Davis' direction by an assistant, describing Mobe, for the purpose of supporting an application for the use of certain Chicago parks.

Defendants' Exhibits 347 and 348 were news films of press interviews with defendants Davis and Dellinger on August 23 and 24.

In excluding all of these, the court appears to have relied at least significantly, if not wholly, upon the proposition that they were self-serving declarations of a defendant, although, as already suggested, testimony as to oral statements equally subject to that characterization was usually admitted.

As stated by Professor McCormick:

"Actually the appropriate rule for the exclusion of a party's declarations offered in his own behalf as evidence of the truth of the facts declared is the hearsay rule. Correspondingly, when such declarations fall within the exceptions to the hearsay rule, which are designed to admit hearsay statements when specially needed and unusually trustworthy, they should be admitted though made by a party and offered in his behalf." [66]

He goes on to point out that courts differ in their treatment of declarations of a present state of mind or emotion, and then says:

"If made under circumstances of seeming sincerity they should come in to show the state of mind or emotion of the accused, as a third party's declaration would when material to show his state of mind. The courts which exclude assume that because made by a party and offered on his behalf the declarations are so likely to be dishonest as not to be worth hearing. This is the same discredited assumption that interested testimony is to be purged not weighed, on which rested the ancient rule that parties could not testify." [67]

We think that a flat rule of exclusion of declarations of a party on the grounds that they may be described as "self-serving" even though otherwise free from objection under the hearsay rule and its exceptions, detracts from the fund of relevant information which should be available to the jury, without, in compensation, materially insuring the integrity of the trial process. As we held in United States v. Bucur, 194 F.2d 297, 301 (7th Cir., 1952), citing United States v. Matot, 146 F.2d 197, 198 (2d Cir., 1944):

"[Defendant] had a right to attempt to meet and overcome this proof [of his knowledge] against him by evidence tending to establish his good faith. To be compelled to meet this

66. McCormick, Evidence, 1954 ed., p. 588.

67. Ibid, p. 589.

challenge without the benefit of testimony concerning his conduct and statements . . . seems to us manifestly wrong. If testimony of this nature is excluded by the legalistic tag of 'self-serving,' an anomalous situation is presented where the accused is faced with the need to bolster his claim of innocence but is deprived of the most logical means of doing so."

We find persuasive reasoning in accord in 6 Wigmore, Evidence § 1732 (3rd ed. 1940):

"But here [in excluding self-serving statements] the singular fallacy is committed of taking the possible trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proved guilty; in other words the fundamental idea of the Presumption of Innocence is repudiated."

See also United States v. Ostendorff, 371 F.2d 729, 732 (4th Cir., 1967), cert. den. 386 U.S. 982, 87 S.Ct. 1286, 18 L. Ed.2d 229.

A flat rule against self-serving declarations, which grew out of the one-time refusal to allow defendants to testify, no longer makes sense. A pragmatic approach should take its place. We find adequate guidelines in Wigmore, § 1732: "There is no reason why a declaration of an existing state of mind, if it would be admissible against the accused, should not be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive."

 Accordingly none of the written statements of defendants should have been excluded by reason of their being self-serving. Arguably some of them may have been objectionable for other reasons, and it is unnecessary here to rule definitively on all. We do think it clear that Davis and Hayden were entitled to have Defendants' Exhibit 235 admitted for consideration by the jury. It was their statement to a group of people interested in similar objectives and

whom they were trying to persuade to a course of action which would lead to the events in Chicago out of which this case arose. On its face the exhibit represented their intent with respect to violence at this stage of development of the plans, at a time not too remote. Whether the statement was deceitful, or whether their plans changed before the time of their interstate travel, was, in the context of this case, for the jury to decide.

## VII. REJECTION OF EXPERT WITNESSES.

Defendants planned to elicit opinion testimony from nine witnesses as experts. Four were called solely to testify on facets of the American society to which the defendants, and convention demonstrators generally, were allegedly responding in August 1968—Rep. John Conyers (racism), Franklin Bardacke (youth culture), Peter Martinson (Vietnam war), Prof. Staughton Lynd (historical rights of protest and revolution). The areas of protest which the witnesses would presumably have explained are most closely related to Yippie and its "Festival of Life." The government objected to the relevance of the testimony in each area.

Five witnesses were called to be both fact witnesses and expert witnesses regarding practices of crowd control and law enforcement—William Styron, James Wright, Richard Gillette, Prof. Gordon Misner, and Wesley Pomeroy. The government objected in each instance to the relevance either of the qualifying questions or of the opinion questions. All objections were sustained.

 It is clear that a trial judge is vested with wide discretion as to the qualifications of an expert,[68] and as to the relevance and materiality of testimony,[69] and that only abuse of such discretion will constitute reversible error.

---

68. Cohen v. Travelers Ins. Co., 134 F.2d 378, 384 (7th Cir., 1943).

69. United States v. Gipson, 385 F.2d 341 (7th Cir., 1967).

■ Exercise of that discretion, however, is gauged by the proper test of admissibility of expert testimony. In setting out the proper test we must acknowledge that there are no hard and fast rules:

> "On this subject can a jury from this person receive appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject, and is not fixed or limited to any class of persons acting professionally." 7 Wigmore on Evidence 21, § 1923.

From that starting point point the D.C. Circuit in Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637, 644 (1962), derived the following approach, to which we subscribe: [70]

> "The principle to be distilled from the cases is plain: if experience or training enables a proferred expert witness to form an opinion which would aid the jury, in the absence of some countervailing consideration, his testimony will be received."

The resulting presumption that informed opinion will be admitted seems particularly appropriate in our increasingly complex society where specialization and segmentation of knowledge are common, in everyday living as well as at highly technical levels, and in our pluralist society with its kaleidoscope of political views and life styles. At the same time it seems that people (including jurors), unexposed to increasing proportions of relevant knowledge and experience, are becoming more capable, because of greater education, of evaluating the expression of expert opinion.

We treat the offered expert witnesses in the two groups their functions suggest.

■ Offers were made of the testimony of witnesses Conyers, Bardacke, Martinson, and Lynd. Representative Conyers described facets of discrimination against black people, including gross under-representation of them in the convention. Mr. Bardacke described the youth culture of 1968, embracing a new relationship with nature, desire to structure society so that people could do work they believe in, and appreciation of people in place of racism. He stated that, in these areas, "there has been an attempt to develop a whole new value system in this country by young people, a revolutionary new value system" and, as to methods of persuading others, that "to young people in this country the street has become . . . a place to meet others, to communicate with other people, to have fun, and to demonstrate your political views. . . ." Mr. Martinson described American use of various tortures in interrogation of prisoners of war and others in Viet Nam. Professor Lynd described the American historical context of protest and revolution and of the first amendment right to petition.

The court deemed the offered testimony irrelevant to the issues.

These observations and opinions were relevant to the reasons why people, young people particularly, may have been moved to come to Chicago to participate in the Festival of Life and in the Mobe activities. To a degree they make the idea of the Festival of Life a little more intelligible to the generation to which the members of this court, and perhaps the jurors, belong. But in order to be received in evidence they must be deemed helpful to the jury on a narrower issue: Did these defendants promote the Festival of Life and the Mobe demonstrations out of genuine belief in protest within legitimate bounds, or did they do so for the purpose of producing a riot?

Perhaps testimony supporting the credibility of having the Festival of Life and Mobe demonstrations without violence may have had a slight tendency to make it less probable the defendants had

---

70. For application of this standard where abuse claimed was admission of certain expert testimony see United States v. Jackson, 138 U.S.App.D.C. 143, 425 F.2d 574, 576 (1970).

ulterior motives, but we are unable to say that the probative value on that issue was so clear that the court's rejection of the testimony in this area was an abuse of discretion.

▇▇ Styron, Wright, Gillette, Misner, and Pomeroy were offered as experts on the subject of crowd or riot control.[71] They were offered to support the defense's theory that

> "if there were any riots in Chicago during the Democratic Convention week, they were caused *solely and exclusively* by the police. The defense maintains that the police brutalized the crowd, and that, in effect, this trial that is going on here is an attempt by the Government to justify what the police did in the streets of Chicago during convention week, and if this witness can testify that the police broke what he considered existing rules, and regulations, and methods of handling crowds to go out of Lincoln Park on Tuesday night, and beat them in the streets of Chicago, that is part of our defense, . . . " [emphasis added.]

No formal offer of proof was made as each was refused, but we do not find that fatal to defendants' raising the issue on appeal. The sort of opinion to be sought and the inference to be raised were set out by Mr. Kunstler when the first of this group was offered, as well as by later attempted questions.[72] "A formal offer of proof is not necessary where the record shows, either from the form of the questions asked or otherwise, what the substance of the proposed

evidence is." D'Aquino v. United States, 192 F.2d 338, 375 (9th Cir., 1951), cert. denied, 343 U.S. 935, 72 S. Ct. 772, 96 L.Ed. 1343.

▇▇ As to four of the five witnesses (Styron and Wright, the first two, and Misner and Pomeroy, the last two) the government objected when the defense attempted to establish that each was qualified as an expert. No opinion questions were subsequently asked of Styron and Wright. The government objected again when opinion questions were asked of Misner and Pomeroy. The government first objected during the testimony of Gillette when the defense asked how certain police conduct compared with the training in riot control which the witness had received in the national guard. All objections were to relevance. All objections were sustained. We conclude the subject for testimony was relevant to the case. One of the elements essential for conviction under § 2101 is a degree of probability that an alleged overt act will produce a riot as defined in § 2102(a). Evidence tending to show that police measures caused the crowd to riot would tend to exonerate defendants' speeches from such responsibility.

Likewise we conclude that crowd reaction to proper as compared to improper police crowd control techniques is not a subject equally within the realm of experience of jury members and the "experts." Crowd dynamics, which are at the heart of the causal question, add an element which may produce an overall reaction quite different from an individ-

---

71. The qualifications of the witnesses vary considerably. Misner and Pomeroy appeared very well qualified; the remainder quite arguably had experience or training which would enable them to form an opinion and which would, because based on experience or training outside the experience of the jury, be of aid to the jury. Given our conclusion that it was error to exclude all expert testimony on this line we do not find it necessary to determine which of the witnesses and how much of this testimony should have been admitted.

72. " . . . a type of question which goes something like this: In your opinion, did the police follow established procedures, and from that, to raise the inference that in breaking established procedures, if the jury believes this witness, the police were motivated by a desire not to really control the crowds in Lincoln Park, but to beat them to the ground so that they would . . . never demonstrate in front of the Democratic National Convention or anywhere else in the City of Chicago. . . . "

ual's reaction. While an individual juror might assess the latter without expert assistance, the former is almost certain to be beyond his experience or training.[73]

Because the testimony of the expert witnesses on the subject of crowd or riot control could have negated a crucial element in the proof of the government, and in the absence of countervailing considerations, we conclude that it was an abuse of discretion to foreclose that possibility.

## VIII. DEMEANOR OF THE JUDGE AND PROSECUTORS.

■ At oral argument, the present United States Attorney suggested that even if error be found, the proof of guilt was sufficient that the verdict should not be deemed the product of error and the error not be found sufficient to require reversal. There is a reasonable degree of judicial tolerance of error when it is less than pervasive, particularly where the trial is a long one. "A defendant is entitled to a fair trial but not a perfect one." [74]

The insufficient voir dire of prospective jurors is the type of error which ordinarily would be found prejudicial in any event. But whatever weight may be ascribed to it or the other errors above mentioned, we are unable to approve the trial in this case as fulfilling the standards of our system of justice.

It is not a simple matter to evaluate this trial, nor to assign responsibility for its deficiencies. It lasted almost five months, and the transcript exceeds 22,000 pages. Trial decorum often fell victim to dramatic and emotionally inflammatory episodes.

Mr. Seale was a codefendant on trial from September 24 to November 5, 1969.

During this period he insisted on representing himself, and some of his conduct resulted in the contempt citations which are the subject of United States v. Seale.[75] Conflict erupted with some frequency. During several sessions, October 29 to November 3, he was bound and gagged.

The courtroom was usually filled with spectators and press personnel. There were numerous disorders and outbursts among spectators, and occasional complaints that there was discrimination in seating arrangements. On occasion, trial procedure seems to have disintegrated into uproar. The record indicates that at times there were as many as 19 marshals in the courtroom. It also shows provocative, sometimes insulting, language and activity by several defendants, instances, but not all, of which are included in contempt specifications in In re Dellinger.[76] Conduct of defense trial counsel, considered contemptuous by the district judge, is also reflected in portions of the record set forth in those specifications.

We are not directly concerned here with definitively assessing the responsibility of these defendants or their counsel for deficiencies in the trial. That will be the subject of proceedings on remand in In re Dellinger.

We make the following observations only to make it clear that in considering complaints concerning the conduct of the trial judge and prosecuting attorneys we have avoided holding them responsible for conduct made reasonably necessary by the conditions at the trial arising from the activity of others.

■ The system of justice can not work if a defendant is permitted to prevent a trial or destroy the effect of an adverse verdict by his own deliberate

---

73. We find a close parallel in United States v. Jackson, *supra*, 425 F.2d at p. 576, where an expert was allowed to describe the techniques of pickpockets who work in pairs, simply because "conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer."

74. Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953), quoted in United States, v. Hoffa, 367 F.2d 698, 709 (7th Cir. 1966).

75. 461 F.2d 345 (7th Cir., 1972).

76. 461 F.2d 389 (7th Cir., 1972).

misconduct. Moreover, it makes good sense to allow reasonable latitude for normal human sensitivity in judging whether responses to provocation deliberately offered are excessive. A defendant ought not to be rewarded for success in baiting the judge and prosecutor.

The prosecutor has the right to object to that which he reasonably deems improper conduct, and the judge the duty to sustain objections, admonish, or take other appropriate action in accordance with his judgment of propriety and necessity. There must be reasonable latitude with respect to the manner in which these duties are performed.

On the other hand, there are high standards for the conduct of judges and prosecutors, and impropriety by persons before the court does not give license to depart from those standards.

The trial judge's behavior must not preclude "that atmosphere of austerity which should especially dominate a criminal trial and which is indispensable for an appropriate sense of responsibility on the part of court, counsel and jury." [77] Judicial comments in the presence of the jury are subject to special scrutiny because of the recognized fact that "the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." [78] Cautionary instructions do not cure a comment "of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." [79] Although in these instances the Court was speaking of portions of a judge's instructions, the same principle must apply to the cumulative effect of a series of judicial remarks deprecating defense counsel and the defense case.

The district judge's deprecatory and often antagonistic attitude toward the defense is evident in the record from the very beginning. It appears in remarks and actions both in the presence and absence of the jury.[80]

The defense presented an extensive case, calling more than 100 witnesses. The judge might, within reason, have alleviated some of the difficulties defense counsel encountered, but he did not do so.[81]

---

77. Offutt v. United States, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11 (1954).

78. Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894); Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946); Moody v. United States, 377 F. 2d 175, 180 (5th Cir. 1967). See United States v. Scott, 257 F.2d 374, 376, 377 (7th Cir., 1958).

79. Quercia v. United States, 289 U.S. 466, 472, 53 S.Ct. 698, 700, 77 L.Ed. 1321 (1933).

80. On the first day, before selection of the jury, the district judge issued bench warrants for four of the attorneys who had earlier appeared for defendants and who were not present for the trial. These four had notified the government of their withdrawal, but had not obtained leave of court. Four other attorneys who had also previously appeared, Messrs. Kunstler and Weinglass and two local counsel, were present. Every defendant was represented by one or more attorneys of record then present. Defendants were objecting to going to trial in the absence, due to illness, of Mr. Garry, a ninth attorney, but were satisfied with the withdrawal of the four who wanted to withdraw.

The four withdrawing attorneys were found in contempt. Two of them who were brought into court were jailed without bail. The record suggests that the government and court were willing to release them if the defendants would acknowledge willingness to proceed without Mr. Garry.

Although the four had an obligation until relieved by the court, and thus were technically subject to its direction in the matter, there appears no real justification for the extent to which the court exercised its power. Two days later, on motion of the government, the court vacated the contempt proceedings and gave the four leave to withdraw. These events occurred well in advance of alleged defense misconduct at trial.

81. Mr. Kunstler appeared of record for some defendants and Mr. Weinglass for others. This arrangement doubtless pro-

There are a number of areas in the law of evidence in which lawyers and judges differ considerably in interpretation of the rules and where the application of a rule is really governed by the discretion or individual views of the trial judge. When a question is leading; when testimony that another person made a statement is admissible because the making of the statement is relevant, even though the statement also contains assertions of fact; when a question on cross-examination is outside the scope of the direct; when a question is objectionable because repetitive—are all examples of such areas. We shall not attempt the task of reviewing all the rulings on evidence in this case. It does appear, however, that in comparable situations, the judge was more likely to exercise his discretion against the defense than against the government.[82]

Most significant, however, were remarks in the presence of the jury, deprecatory of defense counsel and their case. These comments were often touched with sarcasm, implying rather than saying outright that defense counsel was inept, bumptious, or untrustworthy, or that his case lacked merit. Sometimes the comment was not associated with any ruling in ordinary course; sometimes gratuitously added to an otherwise proper ruling; nearly always unnecessary. Taken individually any one was not very significant and might be disregarded as a harmless attempt at humor. But cumulatively, they must have telegraphed to the jury the judge's contempt for the defense.[83]

It must be said that defense counsels' trial technique often seemed inadequate, but even so, gratuitous implications of ineptness before the jury, especially

---

duced some tactical advantages, such as two chances at cross-examination of govment witnesses. On the other hand, it meant that if one of defense trial counsel was absent, the defendants he represented did not have counsel of record present, local counsel having been excused from attending the trial.

Particularly during the defense case, there would have been advantages in having one lawyer free to go to the witness room while the other remained in court. Mr. Kunstler sought permission and defendants were willing to consent, but the judge denied the request. The defense claimed this resulted at times in putting on witnesses who had not been interviewed by counsel. There were a number of colloquies. Occasionally Mr. Kunstler would slip out of the room, and the United States Attorney would report his absence to the judge. The judge's rulings on these matters were within areas normally committed to his discretion, but in these circumstances seem at times to have been motivated by hostility toward the defense.

When the defense case began, the judge began to extend the afternoon session by about a half hour. He declined explanation. On occasion he declined defense requests for a short recess for convenience of defense counsel saying at one time, before the jury: "We have wasted so much time on recesses here, and we want to get rid of this case."

On one Friday afternoon, January 16, when the defense ran out of witnesses at 4:42 p. m., the court announced that the trial would run Saturdays, beginning January 24, further restricting the opportunity of Messrs. Kunstler and Weinglass for out of court efforts.

82. Admonitions against impropriety seem to have been directed at defense counsel for less significant causes than when government counsel offended.

83. Out of several hundred readily identifiable comments of such character in the record more than 150 were made in the presence of the jury. We set forth only illustrations here.

On an occasion when Mr. Kunstler was objecting to the restrictions on his leaving the room, he concluded: "There is no way we can conduct a defense under those circumstances." The judge remarked: "I don't know about a defense, but you are doing some conducting. . . . "

Later the United States Attorney, in objecting to a statement by Mr. Kunstler, referred to his "comic book way" of presenting a case. The judge struck Mr. Kunstler's statement (properly, under the circumstance), but when Mr. Kunstler asked whether he also struck the observation about a "comic book defense," the judge said: "I would describe it differently but I will let that stand."

with the added impact of sarcasm, were not justified.[84]

In dealing with defense witnesses the judge often went beyond the ordinary admonitions designed to prevent unresponsive answers and volunteering.[85]

One of the claims which the defense attempted to establish was that violence (rather than being planned by defendants) would have been avoided had the city administration made different policy decisions about granting permits and about forceful police control of demonstrators. The judge made comments in the presence of the jury denigrating this defense.[86]

84. After a ruling on hearsay grounds, Mr. Kunstler said in an attempt at argument, "I just don't understand it." The judge replied: "You will have to see a lawyer, Mr. Kunstler, if you don't understand it."

On an occasion when Mr. Weinglass was arguing that he had asked appropriate questions for the purpose of impeachment, the court responded: "I would like to preside over a class in evidence, but I haven't the time today." In a similar situation when Mr. Kunstler acknowledged having difficulty, the judge said: "I will be glad privately to tell you how to do it. I haven't any right in a public trial to give you a course in evidence."

When Mr. Kunstler complained that because of changes in length of sessions, it was difficult to keep a supply of witnesses on hand, the judge said, "Don't tell me about how to run this Court. When I have to call on somebody, I will try to get a qualified person. . . ."

After Mr. Kunstler asked a question in which he misstated previous testimoy, perhaps inadvertently, the court sustained an objection. When Mr. Kunstler inquired about the problem, the judge said: "Well, you just made a statement that is inaccurate. I could use an uglier word. It was inaccurate."

The judge often emphasized the fact that defense counsel were not local attorneys. Besides those occasions when the jury was not present, he made similar remarks before the jury, suggesting that Mr. Weinglass was mistaken about something in Chicago because he was thinking of Newark; suggesting, in admonishing Mr. Kunstler for shouting, that he may shout where he comes from, but not here; suggesting, in response to Mr. Kunstler's contention that reproduction of a tape was a misrepresentation because of the volume at which it was played, that it "isn't like the New York Symphony that you may go to when you go back home"; and pointing out, in a colloquy about a distance between two points in Chicago, that Mr. Kunstler was a "visitor."

On occasion, the judge resorted to ridicule. When Mr. Weinglass, on cross-examination, suggested the witness and he "explore" areas of disagreement, there was an objection, and the judge said: "No. We are not at the North Pole. We are not going exploring, Mr. Weinglass."

Shortly before a noon recess, the judge interrupted cross-examination by Mr. Kunstler to admonish him at some length about his posture, apparently because he was leaning with his elbow on the lectern, designed, as the judge noted, by the late architect of the building. At the conclusion of a colloquy on this subject, the judge said, "Since you are tired, we will take a recess and you can go to sleep for the afternoon," and recessed court.

When a witness' testimony referring to a statement by Congressman Lowenstein was stricken, Mr. Weinglass observed that the defense would have to bring him in to testify.

The judge responded: "Well, bring him in. You brought in a lot, you have brought singers and other people. Bring in a Congressman. We have yet to hear from a Congressman. He might be interesting."

85. After such an admonition to a university professor, he went on to say, "This is not a lecture program. You're on the witness stand." Several witnesses indicated, apologetically, that they were somewhat ill at ease under court rules of practice. The judge said to one, "Don't be critical of me. I didn't ask you to come;" to another, "I am sorry. I didn't invite you;" and to a third, "If you are unhappy about being here, maybe you can make an arrangement with the lawyer who called you to withdraw."

86. Under the circumstances defendants were, in effect, challenging the wisdom or good will of the mayor, and posing an issue as to which they and he were adverse. Although defendants were entitled to establish their claim if they could, the the judge did not recognize the issue, remarking "I hadn't seen that the Mayor was indicted in this indictment," and at

In our opinion the defense had the right to present its case before the jury free from the cumulative implications in the type of comments to which we have referred.

Remarks made by the prosecutors in considerable number, and before the jury, were not called for by their duties, and, whatever contribution the defense conduct may have made to the deficiencies of this trial, these remarks were not justified thereby and fell below the standards applicable to a representative of the United States.[87]

another point "I don't observe that any police are parties to this case." When Mr. Kunstler called the mayor as a witness, was prevented from asking questions on the theory they were leading, and asked to have him declared a hostile witness, the judge remarked, "Why the Mayor has been a most friendly witness." Later, in another connection, the judge remarked, "Mayor Daley, as far as I am concerned, and so I am told, is a good mayor."

The purpose of the leading question principle is to reduce the danger, where a witness is favorable to the examiner's side of the case, that the examiner's desires rather than the witness' knowledge will mold the testimony. In the instance of Mayor Daley, the circumstances made it obvious that he would not be vulnerable to leading questions, whether or not he be found to be a truly hostile witness, and the judge could properly have exercised discretion accordingly, with respect to whether questions were objectionable as leading.

Instead, the court restricted the defendants so narrowly that it became difficult for them to elicit specific information. Under the circumstancs a number of the questions to which objections were sustained are more fairly viewed as directing attention to a topic of inquiry, rather than suggesting an answer. Under a reasonable interpretation of the evidentiary rule, many of the objections should not have been sustained. See McCormick, Law of Evidence at 9–11 (1954 ed.)

Furthermore, the court's narrow interpretation of leading questions does not appear to have been equally restrictively applied when the government questioned its witnesses. For example, on an occasion when Mr. Kunstler objected, as leading, to a question asked by the government, the court rejoined, "Mr. Kunstler, do a little research on this matter of leading questions. Really evidence authorities are not very much against leading questions these days."

87. See Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Again we set out only illustrations, all in the presence of the jury.

In objecting to a question put by Mr. Weinglass, the United States Attorney added: "We are not in some kind of kindergarten." After Mr. Weinglass offered his explanation, the United States Attorney said: "This crybaby stuff he goes through, your Honor, every time he asks a wrong question, is just . . . ."

On cross-examination of defendant Davis, the United States Attorney asked when Davis had dreamed up a certain incident. Mr. Davis responded he was present when it occurred and that "You would have to have a pretty active imagination to dream up something like that." The United States Attorney rejoined "I am sure that you could, Mr. Davis." In the same cross-examination, Mr. Davis used the word "precisely" in an answer favorable to himself. The United States Attorney responded: "That is precisely where we get precise language from you, Mr. Davis."

After a question by Mr. Kunstler that was not clearly repetitive, he said: "Objection. Mr. Kunstler has an answer and he likes it so much because two policemen are beating a boy that he asks the witness to repeat it again."

In a colloquy, he said: "That's right. Because the jury has had to sit here and listen to nonsensical questions, direct and cross, wasting all of our time. We want to get it out of the way, ask pertinent questions, determine the facts, get the trial over so that the jury can go home. That's the hurry we're in."

Ojecting to a question, he said: "I object. The question is so bad, Mr. Weinglass had trouble with the last word. He almost swallowed it because he knew an objection was coming. It is an improper question, and I object."

When Mr. Kunstler requested a half hour's variation in the schedule to accommodate a witness, the United State Attorney said: "Your Honor, that was a half hour of trial time. They haven't put a witness on yet that they got on and off in a half hour. Who are they kidding? This is just a showboat."

The United States Attorney, in an interjection which is difficult to relate to the matters then in progress, said "In this case, your Honor, we have heard these people adopt or attempt to adopt Dr. King, attempt to adopt Senator Mc-

During final argument to the jury the court made rulings which were, comparatively, more restrictive against the defense than the government.[88]

In final argument, the United States Attorney went at least up to, and probably beyond, the outermost boundary of permissible inferences from the evidence in his characterizations of defendants. He referred to them as "evil men," "liars and obscene haters," "profligate extremists," and "violent anarchists." He suggested one defendant was doing well as it got dark because "predators always operate better when it gets close to dark."

He yielded to the temptation to exploit the courtroom conduct of various defendants which formed the basis of the contempt citations in In re Dellinger. He told the jurors they need not ignore "how those people look and act," "outbursts in the courtroom," "the sudden respect, the sudden decency" occurring "in the last few days as we reach the end of the case," the suggested similarity between the technique the jurors had seen used in the courtroom with the marshals and that allegedly used at the time of the convention with the police.

Dress, personal appearance, and conduct at trial were not probative of guilt.

---

Carthy, Robert Kennedy, both of whom were better friends of mine than they ever were of theirs."

After a defense witness was admonished by the court about responding exactly to questions, and said she was sorry, the Assistant United States Attorney remarked "It is not difficult at all, and Mr. Kunstler has so very carefully told all his witnesses say what you please, and when you are cut off, say your Honor, this is the first time."

After another defense witness went beyond the question, he said: "The witness is not answering—the witness is very eager, we know, to say all the terrible things the police did, but she is to answer the questions. . . . "

88. Mr. Weinglass referred to the Assistant United States Attorney's summary of certain testimony on which the government relied as the "government's theory." The court sustained an objection to the use of this term.

Mr. Weinglass argued the defense theory that hard line policies of the city had been responsible for what happened and that, in the event of another demonstration in Chicago "I dont think" that a certain practice will be repeated. The Assistant United States Attorney interposed: "Objection to what Mr. Weinglass thinks, or doesn't think, if he thinks at all. It is not relevant here." The court sustained the objection.

Mr. Kunstler stated to the jurors that theirs was an awesome responsibility and they were ultimate arbiters of the fate of the seven defendants. He went on to say that the seven defendants "are not really sitting in the dock here. We

are all in the dock because what happens to them happens to all of us. What happens to them is the ultimate answer to all of us." An objection was sustained.

Mr. Kunstler urged the jurors to decide the case only on the facts, not on whether they liked the lawyers; he said that the lawyers were unimportant, and whether they liked or disliked the judge or the defendants was unimportant, too." The judge broke in to say "I am glad you didn't say I was unimportant."

Mr. Kunstler referred to the fact that the jurors knew he and Mr. Weinglass were from out of town, and to the *Zenger* case where Andrew Hamilton came from Philadelphia to defend Zenger in New York. He suggested that his own ability to speak in this courtroom may have been insured by the decision in 1734 in the *Zenger* case. The judge broke in: "I have to question the validity of that last statement, and I must strike your observation. You were given leave to appear here by the Court in this case. I am not prepared to go back to the 1700's . . . as the basis for the law, and I don't think you have established what the law is either."

When the United States Attorney, in argument, attributed to the then defendants a statement that had been made by former codefendant Seale, and Mr. Kunstler challenged the assertion, the judge answered the challenge by pointing out that, after all, Seale had come back later in the trial as a witness for the defense, and, that "You may remember one of the defendants when I was taking Mr. Seale to task said, 'We support Bobby Seale.' Remember?"

The district judge properly instructed the jurors that they "must not in any way be influenced by any possible antagonism you may have toward the defendants or any of them, their dress, hair styles, speech, reputation, courtroom demeanor or quality, personal philosophy or life style." The United States Attorney should not have urged the jury to consider those things.

We conclude that the demeanor of the judge and prosecutors would require reversal if other errors did not.

## IX. ELECTRONIC SURVEILLANCE.

Defendants raise several issues relating to instances of electronic eavesdropping by government agents.

A. *Conversations of defendants overheard pursuant to authorization on grounds of national security.*

■ Defendants claimed at the trial, but were denied, the right to inspect and have an *Alderman* taint hearing [89] on certain logs which the government asserted were legally acquired, but made available to the district judge before or during trial for his *in camera* inspection only. These logs resulted from wiretapping authorized by the Attorney General on the grounds that such surveillance was necessary to national security. We decided the same issue of law (but with respect to different logs) in favor of defendants' position in United States v. Sale, 461 F.2d 345, 365 (7th Cir., 1972), recognizing that the Supreme Court was considering the same issue in another case pending before it. Since our decision in *Seale*, the Supreme Court resolved the issue in United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), as in *Seale*, in favor of defendants' position. With a possible exception hereafter noted, the rulings of *Seale* and United States v. United States District Court apply to the logs involved here, to the extent that the five remaining defendants can show standing.

We do note that the June 13, 1969 affidavit of the Attorney General asserted that the particular conversations "were overheard by government agents who were monitoring wiretaps which were being employed to gather foreign intelligence information or to gather intelligence information concerning domestic organizations which seek to use force and other unlawful means to attack and subvert the existing structure of the government." The reference to "foreign intelligence information" is not found in the affidavit set forth in United States v. United States District Court, 407 U.S. at 300, footnote 2, 92 S.Ct. 2125, and may indicate that some of these logs may raise "issues which may be involved with respect to activities of foreign powers or their agents," as to which the Supreme Court said it expressed no opinion (407 U.S. at 321, 92 S.Ct. at 2139). We also refrain from reaching those issues at this stage since the record does not unequivocally show that some of the overheard conversations stemmed from surveillance of activities of foreign powers or their agents nor segregate those logs, if any, from the ones disclosure of which is required by United States v. United States District Court.

B. *Conversations concerning Seale overheard pursuant to similar authorization.*

Defendants claim the same rights with respect to logs, furnished after trial, but resulting from a similarly authorized surveillance during the trial and disclosing communications concerning Mr. Seale. These are the same logs which we have examined, and dealt with in *Seale*, 461 F.2d at pp. 364–366. We have already decided in connection with the contempt proceeding that the five remaining defendants have no standing to challenge these logs. In re Dellinger, 461 F.2d 389, 392 (7th Cir., 1972). For the same reason we find they are not entitled to see them or have a taint hear-

---

89. See Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

ing in connection with retrial of this case.

C. *Other conversations of one or more defendants.*

There are also other logs resulting from electronic surveillance of conversations of one or more defendants and turned over to the defense by the government, subject to a protective order of the court. The government did not contest the right to a taint hearing as to these logs.

Because defendants' points with respect to the logs just mentioned are unlikely to arise in the same manner on retrial, we shall consider them only briefly. We do find, however, that defendants were forced to hearing on issues of taint stemming from the last mentioned surveillance without being given a reasonable opportunity to prepare. [90] Before any defendant is retried he must have a reasonable opportunity for a hearing on the issue whether this or other unlawful surveillance as to which he can show standing tainted the government's evidence against him.

■ Defendants' objection to the district court's protective order against disclosure of the logs to others is without merit. See Alderman v. United States, 394 U.S. 165, 185, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). We also find that the record shows no evidence that the government did not in good faith disclose the surveillance materials in accordance with the *Alderman* decision.

## X. SUFFICIENCY OF THE EVIDENCE.

In view of our decision to reverse for trial error and abuse of discretion, we examine the sufficiency of the evidence at the first trial in order to determine whether any defendant is presently entitled to a direction that a judgment of acquittal be entered on remand. We believe it safe to assume that no additional significant evidence will be available at a second trial, if the government elects to retry the cases. We preface our review with several principles which must be observed in determining whether there is evidence to support a conviction.

■ When the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment, the factual issue as to the alleged criminal intent must be judged *strictissimi juris*. This is necessary to avoid punishing one who participates in such an undertaking and is in sympathy with its legitimate aims, but does not intend to accomplish them by unlawful means. Specially meticulous inquiry into the sufficiency of proof is justified and required because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others.

The requirement of judging intent *strictissimi juris* grew out of penalties based on membership as such, Scales v. United States, 367 U.S. 203, 230, 81 S.Ct. 1469, 1487, 6 L.Ed.2d 782, 802 (1961), Scythes v. Webb, 307 F.2d 905, 907 (7th Cir., 1962) (standard for determining intent for deportation of one who is a member of an organization that "advocates or teaches . . . the overthrow by force, violence, or other

---

90. The district court elected to postpone the taint hearing (Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)) until after trial. On February 18, the day the verdict was returned, the district judge announced that he would deal with the matter of the surveillance on February 20. When defendants resisted a hearing at such an early time, the judge said, "I did not say it was a hearing." On February 20, the court ruled that the surveillance author-ized by the attorney general in the interest of national security was lawful, and proceeded to deal with the surveillance logs that the government had disclosed to the defendants earlier. The court refused a continuance to permit Mr. Michael Tigar, defense's expert counsel on electronic eavesdropping, to come to Chicago to participate. The court instead insisted on proceeding with a taint hearing. The defendants said they were not prepared and could not proceed.

unconstitutional means of the Government of the United States"). Its application was expanded in United States v. Spock, 416 F.2d 165 (1st Cir., 1969) to an instance where defendants were charged with a conspiracy rooted in opposition to the draft and to the war in Vietnam. The court described the underlying situation as "a bifarious undertaking, involving both legal and illegal conduct." We adopt the concept for application in this case because, although we are no longer concerned with the charge of conspiracy, the acts charged against individual defendants occurred in the context of a group undertaking with legal (protest of the war and expression, generally, of dissent) and allegedly illegal (violent) branches. It is our belief that this duality would usually exist in an undertaking involving activity of a group and out of which a riot arises.

■■■ In the context of our case, the doctrine of *strictissimi juris* surely precludes (if other general principles do not) a finding that any defendant had an unlawful intent if the finding be based solely on the fact that he participated in planning and organizing the Yippie or Mobe activity out of which riots arose, or on the mere imputation to him of the plan of any associate that such riots be produced.

The *Spock* court said:

"When the alleged agreement is both bifarious and political within the shadow of the First Amendment, we hold that an individual's specific intent to adhere to the illegal portions may be shown in one of three ways: by the individual defendant's prior or subsequent unambiguous statements; by the individual defendant's subsequent commission of the very illegal act contemplated by the agreement; or by the individual defendant's subsequent legal act if that act is 'clearly undertaken for the specific purpose of rendering effective the later illegal activity which is advocated.'" (416 F. 2d at 173).

Hellman v. United States, 298 F.2d 810 (9th Cir., 1961), involved a charge under the membership clause of the Smith Act. Evidence that defendant carried on certain activities was held insufficient because "[t]hey are as explainable on the theory that Hellman sought to effectuate only the Party's legal objectives as on the premise that he personally intended violent overthrow of the Government." (298 F.2d at 814).

We do not, however, understand the *strictissimi juris* doctrine as requiring evidence of unlawful intent so compelling that a verdict of not guilty would be perverse. We do not view it as wholly depriving the jury of its customary function in interpreting ambiguous statements in the light of circumstances and choosing among reasonable inferences. In order to convict, a jury must in any event be satisfied beyond a reasonable doubt. The *strictissimi juris* doctrine emphasizes the need for care in analyzing the evidence against a particular defendant in a case of this type, both by the jury in its fact-finding process and by the court in determining whether the evidence is capable of convincing beyond a reasonable doubt.

■■■ The Anti-riot Act requires that a defendant travel in interstate commerce (or use its facilities) with intent to follow one of the courses listed (A)–(D), each with "a riot" as an objective. See page 357, *supra*, for text. The statute also requires another overt act for any of the same list of purposes. Thus an intent with a riot as the objective is required at both junctures, although the "course," (A)–(D), actually followed may be different from the "course" originally intended. Reasonably construed, the statute surely does not require that the situation, nature, and details of the riot contemplated at the time of travel remain exactly identical until the time of the overt act, but does, we think, require that they be sufficiently similar so that it is reasonable to say the later is the same as or the evolving product of the one intended

earlier. This substantial identity is essential to avoid having this statute impinge on the right to travel, and to tie the interstate travel, which is the basis of federal legislative jurisdiction, to some socially harmful consequence.

Thus we are presented with the unusual problem that, in order to convict, substantially the same unlawful intent must be found to exist at two points in time, separated, in the facts here, by as much as four weeks.

 The cases against the defendants differ in content, but in at least some of the cases it is true that a particular defendant's conduct and statements before travel, if they stood alone, could not establish unlawful intent at that time. Typically there is ample clear evidence (if that offered by the government is believed) that at the time of the alleged overt act the same defendant acted with unlawful intent. Typically the sufficiency of the evidence to support a finding that he had the same intent at the time of travel depends upon the reasonableness of interpreting his earlier statements and acts in the light of the later ones, and of relating back to the time of travel the unlawful intent much more clearly established by later expression and conduct. We do not view the *strictissimi juris* doctrine as requiring clear, direct, and sufficient proof of unlawful intent at each stage, wholly independently of the proof at the other.

As earlier discussed, (A)–(D) are generic descriptions of the necessary overt acts; they are not merely goals to which the overt acts contribute. By definition in § 2102(b) it follows that where the overt act is a speech it must at least have "urged or instigated" the assemblage to riot.

 The speech must cause a high likelihood of riot as defined in the statute. In determining whether it does, it will be appropriate to consider whether the riot in fact occurred, and, if not, whether an intervening force, such as police action, prevented the occurrence.

If the riot did not occur and no such force can be identified, the inference may well be drawn, in the absence of other circumstances, that the speech did not have sufficient capacity to propel action. The occurrence of a riot following a particular speech, or the fact that a force sufficient to prevent a riot intervened, similarly bears upon, but does not conclusively establish the proposition that the speech had such capacity. An organizational relationship between the hearers and the speaker or some other commitment by the hearers to follow the directions of the speaker may themselves establish an adequate probability that his words will produce action.

We point out that conduct other than speech is subject to the statutory penalty. (C) would be fulfilled by pure action. Various conduct which might involve expression only incidentally, such as preparation of weapons and the like, might be an overt act for the purpose of organizing, or carrying on, a riot. Conduct of this sort is not charged in the counts before us. Proof that the hearers are organized to an extent to be committed to following the directions of the speaker may be enough to establish that the directions spoken have the required capacity to produce action.

We now proceed to outline the evidence as to each defendant.

### A. *Proof as to Davis.*

 The alleged overt acts of Davis are speeches at specified locations in Chicago on August 1, August 9, August 18, and August 26. The government proved travel from Cleveland, Ohio to Chicago August 17 to 18. During the defense case travel from Cleveland to Chicago July 20 to 25 was established. The July 20 to 25 travel is doubtless the travel relied on when the indictment was drafted, although reliance on August 17 to 18 travel would be a fatal variance. If the August 17 to 18 travel were relied on, only the overt acts August 18 and 26 could be considered as such, since the other overt acts preceded August 17.

*August 1 overt act:* Davis spoke at a meeting of the Chicago Peace Council with about fifty persons present. He described proposed activities during convention week, including a march to the Amphitheatre August 28. He said that if the demonstrators were not allowed to get to the Amphitheatre, they and dissident McCarthy students "would return to the Loop, flood the Loop with demonstrators, cause disturbances in the Loop, and he said the Loop would fall." The speech was almost four weeks before the proposed action. There was no proof that his listeners were committed to following his directions and we think that this speech was not shown to have the requisite capacity to propel action necessary to qualify as an overt act.

*August 9 overt act:* A meeting was held at the office of Mobe. About twenty-five persons were present, including defendants Davis, Dellinger, Hayden, and Hoffman. Davis and others began recruitment of marshals to guide and control demonstrators during convention week activities. This was the first meeting of marshals. Davis said that the marshals present would be trained, and able to train others who would arrive August 24. He outlined possible march routes and other activities, assigned each person a demonstration target area to map, and appointed committees.

Government witnesses testified that Davis outlined certain plans for violent activity. He said he expected that if demonstrators tried to sleep in Lincoln Park past the 11 o'clock curfew, the police would surround the park and begin arrests. Places should be designated in advance so that demonstrators could form groups. The groups should break out through police lines, rioting if necessary. They should move into the Loop about 7 a. m., "should try to disrupt traffic, should smash windows, run through the stores and through the streets. . . . Generally make havoc in the Loop area."

He mentioned having a "mill-in" on Tuesday and Wednesday during convention. He described a mill-in as blocking traffic, running through stores, smashing windows and trying to shut the Loop down.

Davis and Hayden said that they and Hoffman had been planning diversionary tactics to draw the police away from the Amphitheatre at the time of the march. There would be breaking of windows, pulling fire alarms, and setting small fires.

■ This meeting occurred more than two weeks before the proposed action. There is evidence in the record which would, we think, support a jury finding that the people at the meeting were sufficiently committed as parts of an organization that announcements of plans for action could, without offense to the first amendment, be associated with action rather than expression or advocacy of ideas. The resistance to police action in clearing Lincoln Park eventually occurred except as modified or prevented by the police action itself. We decide no credibility issues, of course, but conclude that there was evidence which, if believed, could support a finding that this alleged overt act occurred.

*August 18 overt act:* Davis presided at a meeting of about seventy-five persons who the jury could find from the evidence were sufficiently committed so that his announcements of plans could be treated as associated with action rather than expression.

According to one government witness Davis said that on Tuesday and Wednesday there would be mill-ins in the Loop. Another testified that Davis said that if the city did not allow the march on August 28th, there would be a mill-in in the Loop and that he would use this information as a lever to obtain permits for the march.

Accepting the latter testimony, the jury could find from the evidence that the mill-in on Wednesday would likely have occurred but for the battle at Michigan and Balbo and thus find in favor of the government as to this alleged overt act.

*August 26 overt act:* This is alleged to have occurred at Grant Park and can only refer to Davis' remarks at the first Logan-statue-incident. The incident occurred near the end of a march of about 1,000 people, led by Davis. The march was a protest over the arrest of Hayden, had passed by police headquarters at 11th and State Streets, and was proceeding north along the east side of Michigan Avenue and the west edge of Grant Park.

There was testimony that as the head of the march came even with the Logan statue, 100 or more demonstrators dashed up the hill to the statue. Some mounted the statue and placed flags on it. Davis was then yelling over the microphone, seven or eight times, "Take the hill, take the high ground." A police line came across Michigan Avenue and formed a skirmish line at the base of the hill. The officer in charge directed the demonstrators to move down the hill. Davis said, "Don't let the pigs take the hill. Keep the high ground. Don't give it up." Thereafter the crowd was screaming, struggling with police, and tossing a few objects. Shortly, Davis announced that the march should proceed to Grant Park across from the Hilton, where a rally was conducted. Later Davis remarked that the people stood up well to the police at the statue and were ready for more things to do.

■ Surging up the unoccupied hill and climbing the statue did not amount to a riot, and Davis' first direction, to take the hill, could not have been an incitement to riot. His direction to keep the hill, however, reasonably implied physical resistance to the police. We conclude it qualified as an overt act of incitement to riot, even though the violence perpetrated by the crowd did not turn out to be serious.

■ *Davis' Intent:* Early activity of Mobe people in planning and organizing convention week demonstrations was (as far as direct evidence shows) consistent with creation of a channel for massed but peaceful expression of intent. The ultimate result was attended by violence. In Davis' case, as well as others', the statements and conduct tending to show an intent to produce violence, and proved by direct testimony, occurred at later stages. As a result, proof of an intent to cause a riot is more direct at the time of the alleged overt acts than at the alleged time of interstate travel.

There were early organizational meetings. There was one in New York, January 24, 1968, at which Davis, Dellinger, and Hayden were present; one February 11, in Chicago, with the same defendants; and one at Lake Villa Camp, near Chicago March 22–24, with Davis, Dellinger, Hayden, Hoffman, and Rubin present. July 20, there was a meeting in Cleveland, with Davis, Dellinger, and Hayden. These three were also present August 4 at a meeting at the Moraine Hotel, near Chicago. In each instance a substantial number of other people also participated. Other meetings followed during August. There was testimony that Davis' speeches at the earlier meetings expressed the view that the demonstrations should be non-violent.

Beginning July 16 there were contacts between Davis and representatives of the city concerning permits for the march to the Amphitheatre, use of parks for sleeping, and sites for assemblies. On July 8 a representative of the Community Relations Service of the U. S. Department of Justice called on Davis and discussed plans for the demonstrations. He and his superiors made efforts to facilitate communication between the mayor's office and Davis, and on July 25 officers high in the Justice Department met successively with Mayor Daley and Davis. On July 29 Davis filed an application for permits, later denied, and later amended, and on several occasions in August Davis conferred with Deputy Mayor Stahl.

In mid-August, Yippie and Mobe filed actions in federal court to compel issuance of permits. Hearings and conferences were held August 21 and 22, and

on August 23 the actions were dismissed. During the conferences the city offered to permit marches on alternative routes and rallies away from the Amphitheatre, and Davis insisted on meeting near it. Davis said he wanted a peaceful assembly, but predicted that a fight would break out between demonstrators who needed to sleep in the parks and police, if the police attempted to expel them. He said it would be suicide for the city not to consider the request for sleeping in the park. Without resolving other issues, the city offered and Davis accepted a permit for the rally at Grant Park the afternoon of August 28.

At various times Davis estimated the number of demonstrators at 50,000 to 500,000 and the number of marshals from 2,000 to 2,500. Actually the number of demonstrators did not exceed 15,000, and marshals 200–400. The defense view would be that the estimates were in good faith and the smaller actual number resulted from fear induced by the city's hard line; that Davis' delay in formal application was, for various reasons, consistent with good faith. The prosecution point of view would be that Davis' designs were better served by denial of permits and the size of his demands and delay in application would make the city less likely to cooperate with him.

The training of marshals occurred on a number of days in August in Lincoln Park. Davis was present at times. The marshals were trained in group formations and individual techniques of physical combat. These formations and techniques were capable of aggressive use although the defense claimed that they, like the arrangements for first aid and legal aid, were decided upon because of expectations of police aggression and violence.

Statements by Davis before August 1 were either ambiguous or indicated plans for peaceful demonstrations. At times during August he made statements, according to government testimony, which showed that he planned for violence. The statements charged as overt acts have already been referred to. On August 4, Davis and Hayden privately conversed about using a marshals' formation to break police lines and preparing mace for the demonstrators to squirt at police. Davis told the Moraine Hotel meeting that there would be a "mill-in" in the Loop August 29. On August 6, Davis told Deputy Mayor Stahl that the city's failure to issue permits was an invitation to violence.

At the August 9 meeting, Davis said, with reference to a rock festival on the 25th, "We are going to invite the McCarthy kids, the young delegates and children of prominent people . . . lure them here with music and sex . . . keep the people there after 11 o'clock because we will keep the music going on . . . and the marshals' duty at that time should be to go out and build the barricades . . . and that if the police came in, some of these people that were invited would be injured and sympathy would develop for the National Mobilization Committee, because these people would have been injured as the police were trying to clear the park after 11 o'clock closing time."

On August 15, Davis told a group that since they could not avoid confrontation with the police, the demonstrators were going to harass and provoke them through the whole convention. On August 19, he promised defendant Hoffman that the marshals would aid in defending Lincoln Park. On August 22 he told representatives of the city that it would be suicide for the city not to consider permitting demonstrators to sleep in the park. On August 26, Davis told defendant Rubin and others there should be a sit-in in front of the Hilton, and when the police broke it up, the demonstrators could break windows, pull fire alarms, stone police cars, break street lights. After midnight, Davis was at the barricade in Lincoln Park urging people, over a bullhorn, to fight the police. Early in the morning of August 28, demonstrators were massed in front of the police line. Davis gave directions that the

demonstrators kick the police in the shins so that they would react by clubbing the demonstrators. He pointed out that the TV cameras would pick up the police action, but not the provocation. Apparently these plans were not carried out. On the morning of August 28, he told Dellinger, Hayden, and others that after the bandshell rally, the attempt by some to march to the Amphitheatre could create a diversion and others could rally across from the Hilton or go into the Loop and have the mill-in. Just before the rally, he addressed a meeting of marshals and told them that they should split up, each taking a group to one of several hotels or the Amphitheatre, and as a result the police would be dispersed and their effectiveness weakened.

There is evidence of earlier statements by Davis which were ambiguous with respect to whether violent or peaceful but vigorous activity was intended. He described the action he intended to bring about as "militant." This term can, but need not, mean riotous activity. In a speech in November, 1967, he said there would be civil disobedience to disrupt the convention. He admitted that he "may have" said in March that there should be a week of demonstrations, disruptions, and marches, clogging the streets of Chicago; that the march on the convention should make the democratic process work by pinning the delegates in the Amphitheatre; and that activities must be employed that will force the President to use troops to secure his nomination. In a paper written in the fall of 1968, Davis and Hayden included the statement, "We hurt the people who rule this country. We impose an international humiliation on them."

We think there is ample evidence, if believed and if allowable inferences are drawn favorably to the government, to justify a finding that Davis had the required criminal intent at the time of travel to Chicago August 17–18 and at the time of the alleged overt act, August 18. It is much less clear that he had such intent at the time of his travel, July 20–25. He did not admit having such intent in August, but his position would clearly be that if he had it by then, it was not his original plan, but was the result of his frustration in dealing with the city. Whether this is true depends upon an evaluation of his good faith in appearing to seek permission for peaceful demonstrations and we conclude this is a jury question.

### B. *Proof as to Hayden.*

Hayden's overt acts were alleged to have occurred at specified locations in Chicago on August 26 and August 28. The government proved that Hayden traveled from New York to Chicago between July 25 and August 4.

*August 26 overt act*: Hayden is alleged to have spoken to an assemblage at Lincoln Park. Apparently the government relies on remarks Hayden made as police officers were approaching to arrest him. Officer Riggio testified that he and his partner saw Hayden and Lowenthal in a group of people. After alerting other officers, Riggio and his partner approached. "Mr. Hayden and Mr. Lowenthal stood up and informed the group, 'Here come the two coppers from last night. They are going to arrest us.'" The arrest was effected. Members of the crowd screamed and two people offered argument. The testimony does not indicate there was any forceful activity by the crowd. The night before when the arrest had been attempted, Hayden and Lowenthal had resisted and called for help and the crowd had pressed against the officers causing them to desist. Whatever the case on August 25, there is no basis for interpreting the remarks on the afternoon of August 26 as inciting the crowd to violence, and there is a failure of proof as to this alleged overt act.

*August 28 overt act*: This is a speech Hayden gave at the afternoon bandshell rally. He spoke from the platform, just before the end of the rally, as follows:

"May I briefly—two points; the first is—remember Rennie Davis. Rennie Davis, project director of the Mobilization is in the hospital with a split

head. We are in close touch with him. He's going to be all right, but he would want you to do for him what he is unable to do because he is in the hospital—and that is make sure that if blood is going to flow, let it flow all over the city. If gas is going to be used—let that gas come down all over Chicago and not just over us in this park. That if the police are going to run wild let them run wild all over the city of Chicago and not over us in this park. That if we are going to be disrupted, and violated, let this whole stinking city be disrupted and violated, let this whole military machine which is aimed at us . . . around the city, don't get trapped in some kind of large organized march which can be surrounded. Begin to find your way out of here. I'll see you in the streets."

It does not appear that his listeners dispersed through the city and disrupted and violated it as he seemed to be suggesting. There followed, however, the lineup for the march, the waiting for it to begin, the flowing of people toward the Hilton, and the battle at Michigan and Balbo. There was evidence from which it could be found that some of his listeners had armed themselves with various types of crude weapons and made use of them during the battle. The inference would be legitimate that the weapons would have been used elsewhere if not there. There was testimony concerning one group of people, led by Rubin, who moved through downtown streets Wednesday evening, throwing rocks at cars, and the like. We conclude that Hayden's speech at the rally could be found to have been an incitement to riot.

*Hayden's Intent*: In Hayden's case there was testimony of public and private statements that the demonstrations at Chicago should not be violent. He attended the organizational meetings as indicated under *Davis' Intent*, above.

There was testimony of statements by Hayden before July 25 which could readily be interpreted as calling for violent activity. On March 14, 1968, he spoke at a meeting of the Resistance in New York. He said that he and Dellinger were planning demonstrations in Chicago and it was Mobe's purpose to fuck up the convention. In May he was in the Mobe office in Chicago, being interviewed by a reporter. He was called into the next room to take a long distance call from New Jersey, and was heard to say during the call, "Fine. Send them on out. We'll start the revolution now. Do they want to fight?"

There was testimony that on July 25 Hayden spoke at a meeting in New York of the 5th Avenue Peace Parade Committee. Speaking of the war in Vietnam, he said that the "United States was an outlaw nation. . . . it had broken all of the rules, and therefore the peace demonstrators could break all the rules, too. . . . He spoke about the fact that the North Vietnamese were shedding blood and the peace demonstrators when they went to Chicago should be prepared to shed blood, too. He said there would be more arrests in Chicago and right through the election than the jails could hold."

At a meeting in Washington on April 14, 1968 Hayden said that the demonstration at Chicago "had to be put together in such a way that it made clear to the people of the country that it was the government that was violent."

There was also testimony concerning statements on and after August 4, tending to show that Hayden called for violent action. Hayden's August 4 conversation with Davis had already been referred to. Hayden was present at sessions for training marshals.

At the marshals' meeting August 9, Davis and Hayden said they and Hoffman had been planning diversionary tactics to draw the police away from the Amphitheatre at the time of the march. There would be breaking of windows, pulling fire alarms, and setting small fires.

On August 17 there was a meeting of about twenty-five people involved in pre-

paring for the demonstrations. Speaking of a vigil at the Amphitheatre the night of the 28th, Hayden said they could knock down the fences the city had erected at that location. He also indicated approval of a suggested mill-in Wednesday, in lieu of a march, to shut down the Loop.

On the afternoon of August 27 Hayden spoke to a group in Lincoln Park, discussing what should happen at 11 o'clock when the police plans became apparent. "Most people seem to feel at this time that we will leave the park at 11 o'clock if we are threatened with death and all that, but we will be back in the park by any means necessary at the time that we decide it is necessary to be back in the park."

Very early in the morning of August 28, Hayden spoke to the demonstrators in Grant Park. He referred to the march planned for the afternoon, and closed his speech, saying, "We are going to make our way to the Amphitheatre by any means necessary."

Hayden attended the planning meeting on the morning of August 28. There was testimony that he said, with reference to the denial of permission to march, "If the City doesn't give in to our demands, there would be war in the streets and there should be." Davis suggested having the demonstrators who had been injured speak at the rally. Hayden objected, saying, "In a revolution you expect injuries, and those injuries aren't supposed to be displayed. The injured people shouldn't be displayed. They should be accepted, and the struggle should go on."

The jury could properly interpret the statements as indicative of an intent to cause violence rather than as merely inflammatory rhetoric. On the night of August 28, when asked by a reporter for an evaluation, after the last few days, of the effectiveness of Mobe, Hayden said, "Well, I think it's been a tremendous success. We accomplished everything that we expected to accomplish." As stated in discussing the evidence against

Davis, Hayden and Davis wrote that they had imposed an international humiliation on the people who rule the country. We conclude there is sufficient evidence to sustain jury findings that Hayden had the required criminal intent at the time of travel July 25 to August 4 and on August 28.

C. *Proof as to Dellinger.*

The government proved travel from San Diego, California to Chicago between July 25 and August 4. It was also established that Dellinger acted as master of ceremonies and made a number of remarks at the bandshell rally August 28. His speaking at Grant Park that day was the only overt act alleged against him.

He introduced eight speakers. At the time of the flagpole incident and the police action which followed it, he interjected several remarks urging people to be seated and leave the situation to the marshals. Later he announced word from a deputy chief that the police were being withdrawn. He gave directions for forming the march to the Amphitheatre which he was to lead and which was to be non-violent. Taken literally, his remarks in the partial transcript in evidence contain no urging or instigation to riot.

The government theory appears to be that Dellinger's introduction of Tom Newman, and Dellinger's suggestions that those who wished to follow Newman's recommendations could begin to leave the rally qualified as an overt act under the statute.

There was evidence of a plan to have groups of demonstrators, led by some of the marshals, go to various sites for a mill-in, so defined as to be a riot rather than non-violent demonstration. Marshals were to circulate among the crowd at the rally describing the several options. There was evidence that Dellinger knew of the plan and indicated his approval.

Dellinger said in his first remarks that "this is a meeting for action—not for speeches." He introduced Bo Tay-

lor, who said, among other things "I didn't come down here to sing, I came didn't come down here to sing, I come ready and I hope everybody in this crowd who's expectin' to fight keeps the fists up here." At one point Dellinger said, "We will have clear announcements with definite—with definite options. Some people may be prepared to act in one way, in fact we envision at this point three different alternatives amongst which people can choose."

Before introducing Tom Newman, Dellinger said, "Now there are going to be at least three different ways in which people will want to act. In a moment I'm going to call on someone to talk about one of them." He went on to give directions for the assembly for the march he would lead, then referred to those "people who believe that it is important to get away from here and to regroup and take other action."

Newman then spoke, referring to assaults by the police, saying that many felt they were going to have to fight for space free of such assaults, and closed. "If we are not allowed space, they will not be allowed space. We are no longer waiting for them to make moves. We have decided, some of us, to move out of this park in any way that we can, to move into their space in any way that we can, and to defend ourselves in any way that we can."

After Newman's speech, Dellinger apologized for having been engaged in conversation and not hearing what Newman said, but added "I'm sure he made his message clear about those who believe it is better to get out of here and to regroup and to take other action. They should be—can be doing that now —"

After giving further directions for the gathering for the march, he introduced Hayden, who spoke as set forth under Hayden's *August 28 overt act,* above.

 Obviously there was evidence from which the jury could properly find that Dellinger knew and approved of plans for violent action, to be triggered by Newman's remarks. With that knowledge, he introduced Newman and endorsed his project, albeit guardedly.

The majority of the panel concludes that the record contains evidence sufficient to support a finding that Dellinger performed an overt act under the statute, as charged, punishable without impairment of the first amendment. The writer of this opinion holds the opposite view.

*Dellinger's Intent*: The evidence tending to establish intent may be analyzed as follows:

In Dellinger's case, as in Davis' and Hayden's, there was testimony of a number of statements that the convention activities should not be violent. He attended the organizational meetings as indicated under *Davis' Intent,* above.

A letter distributed August 23 over his signature together with those of co-chairmen Peck and Kalish states what the defense claims was genuinely his position. It read in part as follows:

"We are sure that you realize that this is a testing time in Chicago. Although our plans are for non-violent actions and we have made clear for months that we do not desire to obstruct the convention or to interfere with the movements of delegates in or out of the convention, Mayor Daley and the Democratic Party have turned Chicago into an armed camp of National Guardsmen, airborne troops on standby, barbed wire, tanks, Mace, and every conceivable weapon of intimidation and repression.

"Chicago is fast becoming the Prague of the Middle West. We disagree with those who have urged their supporters to stay away because of the danger of violence and repression. Instead we are appealing to people to make it clear that we will not lose our democratic rights by default.

"We plan to assert our rights to march to the convention and to hold public hearings there. . . .

"But we need other persons, too, persons who come not to confront the repressive machinery, but to assemble peacefully in a park, to hold a meeting for which we have a permit and where, whatever happens elsewhere, there should be no likelihood of trouble of any kind. A mass people's assembly will convene on August 28 at one p. m. near the band shell at Grant Park, just east of. the Loop, and will conclude at four p. m. This makes it possible for people to come to Chicago for that one day, arriving at noon, and departing in time to be home again at a reasonable hour.

"Thousands of people, men, women, children coming in for the day to make a tremendous witness for peace and racial equality, and at the same time provide pressure on the city and the administration to come to their senses and deal properly with those who will be carrying the challenge one step further by proceeding to the Amphitheatre."

There was testimony that Dellinger was present at the August 9 marshals' meeting described under Davis' overt acts and that Dellinger said he agreed with the plans outlined by Davis. He had attended the meeting August 4 at which Davis said there would be a "mill-in" in the Loop August 29. He participated in the meeting the morning of August 28, and Davis' suggestion of a rally near the Hilton or a mill-in in the Loop was a response to Dellinger's assertion that a march should be least be tried, and that it could be a diversion to get people out of Grant Park and others could "do a more militant action." Assuming Davis' remarks stated plans for a riot, Dellinger's apparent approval would be evidence that he had the same intent.

On July 25, in San Diego, Dellinger spoke at a meeting on a college campus. There is testimony that he said "Burn your draft cards. Resist the draft. Violate the laws. Go to jail. Disrupt the United States Government in any way you can to stop this insane war—I am going to Chicago to the Democratic National Convention where there may be problems." Then, shaking his fist, he said, "I'll see you in Chicago."

At a meeting of Mobe leaders with a deputy mayor August 12, Stahl testified that Dellinger "said to me, that he had just recently returned from Paris where he had been studying street riots of the students at the Sorbonne. He said he was studying these because he was anxious to know why they failed, and was interested in the whole subject of demonstrations and street activities. He said he was, however, not interested in violence or disturbing the delegates or the convention—He said that he believed in civil disobedience, that the activities of the Mobilization Committee at the Pentagon, where they invaded the building, were an example of the kind of civil disobedience that he believed in." Mr. Baugher testified that Dellinger also said "he was convinced that people were willing to use violence to obtain their civil rights if it was necessary and that this city had better pay attention to what was happening."

Stahl testified that at a meeting August 26 after the arrest of Tom Hayden, Dellinger "said that it was necessary that a permit be issued for sleeping in Lincoln Park in order to minimize destruction—that anger over the arrest— was going to seek expression."

The majority of the panel (other than the writer of this opinion) concludes that the record contains sufficient evidence to support a finding that Dellinger intended, when he came to Chicago between July 25 and August 4, to incite, organize, promote and encourage a riot.

D. *Proof as to Hoffman.*

The alleged overt acts of Hoffman are speeches at specified locations in Chicago on August 26, August 27, and August 29. The government proved travel from New York to Chicago August 7.

*August 26 overt act:* There is testimony of a meeting of 40–50 people in Lincoln Park, termed a marshals' meeting, August 26 in the afternoon. Hoff-

man asked spectators to leave and then said "the purpose of the meeting was to form self-defense groups of five or six people and that these groups were to be assigned specific areas in Lincoln Park to hold when the police attempted to drive them out after eleven o'clock." He called for volunteers. Several groups were formed, and Hoffman said that if any trouble should occur, one member of the group was to come to the communications center, and the communications center would then dispatch help to them.

Bearing in mind all the circumstances tending to show that the persons to whom these statements were made were committed to action and those tending to show violence by the crowd in resisting the clearing of the park by police that evening, we think there was sufficient evidence for the jury to find these remarks urged violence and had the necessary capacity to propel others to riot.

*August 27 overt act*: There was testimony (disputed) that on Tuesday evening, August 27, Hoffman was at the center of a group of 200 or more prople in Lincoln Park. He said, "Tomorrow we're going to meet in Grant Park, and we're going to storm the Hilton. We got to get there singly because if we go in groups the blank pigs are going to stop us. . . . We can't make it without weapons. We are going to need a lot of weapons, so we should bring rocks, bottles, sticks, and another good weapon is a brick. But we have to break the bricks in half so that it will be easier to conceal and it will be easier to throw, and the girls can throw them too." There was discussion between Hoffman and others of other weapons and the need for self-protective equipment. Someone asked about holding the park that night, and there was testimony that Hoffman replied, "Yeah, we should hold the park at all costs. It's our park, and the blank pigs have no right to push us out. It's our park. We're going to fight."

Considering all the circumstances including the fact that there was violent resistance to police action that night and

evidence of some preparation of missiles before and use during the battle at Michigan and Balbo after the rally the next day, we conclude there is sufficient evidence from which a jury could find these statements were an overt act under the statute.

*August 29 overt act:* Police stopped a march south on Michigan Avenue, and the demonstrators, several thousand, then proceeded north. At the Logan statue, Deputy Superintendent Rochford ascended the hill and talked to the crowd. There was testimony that Hoffman shouted through a bull horn, while pointing to Rochford, "We have the big cheese now. Let us kidnap him and take him to the Amphitheatre and now we have got our bargaining power." The officer's testimony went on "At this time the crowd began to get up and cheer, and began to move forward. My partner and I began to move up toward the Deputy Chief and the one or two sergeants who were there. . . . At this time the squad of policemen who were stationed on the sidewalk moved in and surrounded the Deputy and then led him down from the incline." There was testimony that Hoffman had solicited individuals to help in the kidnapping plan.

On cross-examination, Hoffman was asked whether he had stated in his book: "That you [Hoffman] told Dick Gregory that the rap to the cops was a bluff and your strategy was to get the head cop down here, grab him and get us through; the other pigs wouldn't touch us. Gregory said what if they did, and you replied, 'I'll kill the top pig and I meant it.'" Hoffman answered that he had written the statement, although he characterized it as "a mythical suggestive interpretation, very loose." He also admitted writing "that you [Hoffman] announced publicly the plan to kidnap the head pig and to snuff him if they touched us." We think the evidence would permit a jury finding that this was a sufficient overt act under the statute, and that violence (or at least assault on Rochford) was prevented by the police action.

*Hoffman's Intent*: Hoffman, Rubin and others began in late 1967 to plan activity in Chicago during convention week, 1968. Letters were distributed explaining and promoting Yippie and the planned festival of life. A number of entertainers were invited to appear. Many who were willing to appear if city permits were obtained ultimately declined when it became apparent the city would not permit use of a park in the manner contemplated. Admittedly it was planned that participants would be free to "do their thing" and laws and ordinances might well be violated by public nudity, fornication, and use of drugs.

In March, 1968, a Yip-in at Grand Central Station in New York ended in violent confrontation with police. A peaceful Yip-out was held weeks later in Central Park, New York, apparently with a more permissive policy being followed by police.

Hoffman and Rubin attended the Lake Villa meeting in March. On March 26, 1968 a letter, asking the city's cooperation, was delivered by Hoffman, Rubin, and others to the parks department and the deputy mayor. No reply was ever received. Applications were submitted July 15 and August 8. An action was brought in federal court at the same time as the action by Mobe, but was withdrawn.

Although there was considerable testimony of statements by Hoffman indicating that he desired no violence, there was also testimony of the following:

On August 7, Hoffman, Rubin, and others met with Stahl. Rubin said they were going to hold classes in defense against the police. Hoffman said "he was prepared to tear up the town," "willing to die in Lincoln Park," that if "the city was smart, we [the city] would spend a hundred thousand dollars to sponsor the Festival of Life. Then he said, 'Or better yet, we would give them $100,000 and they would sponsor the Festival of Life' or he said, 'better still, we would give him a hundred thousand dollars and he would leave town.'"

On August 9, Hoffman was present at the marshals' meeting, already described with respect to Davis.

On August 19, Hoffman said at the meeting already described that he wanted the Mobe marshals to assist in the defense of Lincoln Park, starting August 25.

On August 20 and 21, Hoffman was present when marshals were being trained in various maneuvers.

On August 24, Hoffman told a group which included Davis and Hayden that if the police don't let them sleep in the park they are going to go into the downtown area and take over the hotels.

On August 25, a newsletter concerning the Lincoln Park festival contained a statement attributing authorship to Hoffman and Rubin and dealing with the police pushing the demonstrators out of the park. It said, "leave the park in small groups and do what is necessary . . . make them pay for kicking us out of the park but let's win."

On August 26 Hoffman demonstrated to others a technique for warding off a blow with the arms while kicking the assailant. Rubin was present and described the activity as "giving lessons in self defense and instructions on how to fight the pigs." Hoffman said earlier that day that "tonight we're going to hold the park." He said, "If they push us out of the park tonight, we're going to break windows. . . . We're going to F___ up the north side."

On August 27, Hoffman told the press, "We're consistently going to fight for our right to be in that park, but the police just push us out in the street, and what do they expect thousands and thousands of people to do. It seems they care more about a City Ordinance about not sleeping in the park than they do about the destruction of Chicago." Earlier that day, Hoffman referred in conversation to "the police car we busted up in the park last night."

On cross-examination, Hoffman admitted that before the convention he had said that people will fight cops in Chica-

go; that many people may fight and die in Chicago; that he has written that he "considered it much better strategy to have the cops drive us out of the park each night," and that "We are going to wreck this fucking society because if we don't, its going to wreck itself;" that "all the way on the plane going back to New York you wondered what the fuck we would have done if they let us stay in Lincoln Park at night. As usual the cops took care of the decisions;" and . . . "When I left Chicago I felt we had won a great victory. The lines between us, the people in the streets and them, the people in authority, had been clearly established. The police had seen to that. . . . With a small number of people we had been able to successfully do damage to a huge and powerful political party."

Hoffman admitted that on August 29 "you toasted your victory with champagne at Mobe headquarters" and that later he wrote, "It is debatable whether or not the Grand Central massacre helped or hurt our chances in Chicago. I maintain it helped tremendously." He considered that it "let the whole world know that there was going to be blood on the streets of Chicago. . . ."

As in the cases of some of the other defendants, there is ample evidence to support a jury finding that Hoffman committed one or more overt acts with the intent required by the statute. The question then becomes whether the intent was formed after arrival in Chicago, in response to circumstances experienced there, or whether there is sufficient evidence to support a finding that Hoffman had such intent when he came to Chicago from outside Illinois. Some of his demands on the city were unreasonable, and this lends support to the inference that he intended to produce a negative reaction from the city and thus make it easier to cause violence. His statements to Stahl on August 7 were made immediately after arrival, and this fact supports the inference that his intent to "tear up the town" existed when he came, rather than being generated by

subsequent events. In the light of propositions just stated, we think the evidence was sufficient to go to the jury, and presumably would again be sufficient at a new trial, if the government chooses so to proceed.

E. *Proof as to Rubin.*

The alleged overt acts of Rubin are speeches at specified locations in Chicago on August 25, August 26, and August 27. The government proved travel from New York to Chicago between July 23 and August 7.

*August 25 overt act:* There was testimony that Rubin was in Lincoln Park, wearing a football helmet, with three to four hundred people sitting, standing, or lying nearby. Eleven police officers were standing near a park building. Rubin waved his arm and shouted, "Look at these mother-fucking pigs . . . standing over here. . . . They have to be standing in the park protecting the park, and the park belongs to the people. Let's get these fuckers out of here." The people gathered nearer Rubin, shouting; he began to walk toward the policemen, and the people followed. After further yelling, Rubin flicked a cigarette butt toward the officers, and the crowd began to throw cans, bottles, stones, and debris at the police. Rubin continued yelling for a time, but left the scene while the people were still throwing.

We conclude the jury could find this conduct an overt act under the statute.

*August 26 overt act:* There was testimony that Rubin made several speeches to groups August 26 in Lincoln Park. Selecting one just before the building of the barricade, the testimony was that about 600 were present. Rubin got up on a table at the so-called command post and shouted, "Now is the time to make your stand. Arm yourselves with anything you can find and follow the marshals. If we don't band together now, all is lost—Hold the park at all costs even if it means giving up your own life." The crowd cheered and shouted, built the barricades, lit fires, and threw

debris at the police. Later when the police moved to clear the park some members of the crowd assaulted some of the officers.

This could be found an overt act under the statute.

*August 27 overt act*: There was testimony of more than one speech or conversation by Rubin August 27 in Lincoln Park. The one which comes closest to qualifying as an overt act was a conversation with ten marshals in which he said, "Abbie and I want the park held tonight at all costs, and if we are pushed into the streets, we are going to riot and F-up Old Town." Construing this as a direction to people committed to follow it, we think it can qualify as an overt act under the statute.

*Rubin's Intent*: Reference has already been made to Rubin's presence at meetings with Hoffman. Although there was testimony of statements by Rubin indicating that he wanted no violence, there was also testimony of the following:

In late 1967, conversing about the youth festival in Chicago, Rubin said the presence of 100,000 young people would so terrify the establishment that the nomination would have to be made under armed guard. "I think the beauty of it is that the establishment is going to do it all themselves. We won't do a thing. We are just going to be there and they won't be able to take it. They will smash the city themselves. They will provoke all the violence."

On July 23, 1968, Rubin addressed a large street rally in New York. He said in substance "that the people should mass and cause disruptions to the election system in the United States.—He said in Chicago during convention and on election day these disruptive tactics should be such that the candidates would not be able to campaign publicly, and he also said that thousands and thousands of people will be in Chicago so as to implement this, these disruptive tactics."

On August 25 Rubin spoke to a group in Lincoln Park in early evening, saying that "we" are prepared to stay in the park all night and will fight to keep the park. On other occasions he told people not to let the police push them from the park and "Wednesday is the big thing. Arm yourselves and fight the pigs."

On August 26, in Lincoln Park, after the arrest of Hayden, Rubin, conversing with an undercover police officer, said, "We're going to get even with these 'F----n' pigs . . . we're going to hold the park, if we're pushed into the streets, we're going to go to the Old Town area where when we break windows and start fires, we'll have a place to hide." He made several speeches telling people to "Arm yourselves with anything that you can find and fight the pigs." In a conversation where Davis suggested the people should go into the Loop and break windows, Rubin said they should also start fires. Rubin also went through the park, from group to group, and said, "We have to fight the pigs in the park tonight—We're not going to let them take the park."

On August 27, in discussing a newspaper headline "The Battle of Chicago" with the same officer, Rubin said, "We have got to create little Chicagos everywhere, that we've got to have riots in every city." He said in another conversation that in holding the park they should use "the same tactics as the Viet Cong, use the hit and run tactics." Later when the crowd began pelting a police car with rocks and other objects, Rubin and the crowd yelled, "Get the pigs." After leaving the park, Rubin was with a group engaged in various acts of vandalism, and he threw a bottle of paint at a police car.

On August 28, at the bandshell, Rubin told the officer that he and other leaders had told their people "to bring back to their home cities the revolution that had started in Chicago." After the flagpole incident a group, including Rubin, jumped on a police car and tried to roll it over. Rubin screamed, "Kill the pigs. Kill the cops."

Later in the evening after the Michigan and Balbo battle, Rubin led a crowd

through downtown streets throwing objects at cars, and the like.

As in the other cases, the sufficiency of the evidence that Rubin intended to cause a riot when he arrived in Chicago is a closer question than the sufficiency of the evidence that he had such intent at the times of his overt acts. It is our judgment, however, that the evidence was sufficient to go to the jury, and presumably would again be sufficient at a new trial, if the government chooses so to proceed.

In summary, although certain overt acts charged against Davis and Hayden were not proved, there is evidence upon which one or more of the overt acts charged against each of the defendants [91] could be found by a jury to have occurred, accompanied by, and preceded at the time of interstate travel by the unlawful intent charged. With respect to the particular situation of Davis, conviction conceivably could be based on either (1) a finding that he traveled from outside Illinois to Chicago between July 20–25 with the requisite intent and performed any one of the overt acts of August 9, August 18, or August 26 with the requisite intent, or (2) a finding that he so traveled August 17 with such intent and performed either the August 18 or August 26 overt act with such intent.

## XI. MATTERS OF SIGNIFICANCE IN THE EVENT OF A NEW TRIAL

In deciding that the record contains evidence sufficient to support a verdict of guilty, we do not suggest any opinion that defendants are in fact guilty of the offenses charged under the Anti-riot Act. There is evidence in the record which, if believed, and inferences favorable to defendants drawn, would lead a jury to acquit. The decision whether to bring the matter to trial again is one for the government to make.

We set forth here conclusions which have significance only if there is a new trial.

Defendants have made several claims of error with respect to the first trial which we conclude are unfounded. Since the same claims might arise if there were a second trial we pass upon them expressly.

*A. Claim that use of testimony of undercover agents is unconstitutional.*

■ Defendants argued that the trial court should have suppressed the testimony of undercover agents because use of such agents violated their first, fourth, fifth and sixth amendment rights. These city police officers and government agents testified to conversations with individual defendants as well as remarks made at planning meetings and public rallies. Similar arguments were rejected in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). See United States v. White, 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L. Ed.2d 453 (1971). In *Hoffa*, the Court quoted Mr. Justice Brennan's remarks in his dissent to Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L. Ed.2d 462 (1963), which we find dispositive here: "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak."

*B. Claim of represented defendants' right personally to address the jury.*

■ Defendants urge that the trial court erred in denying them the right to conduct personally their own closing argument to the jury. They claim that the right derives from the common law. The judge in denying the request said that the decision was within his discretion under 28 U.S.C. § 1654 [92] and that

---

91. The writer holds the opposite view with respect to Dellinger.

92. "In all courts of the United States the parties may plead and conduct their own

some defendants, in light of their prior conduct during the trial, might be disruptive during argument.[93] The old common law rule has changed because its purpose was based on another rule—that a defendant could not testify in his own behalf—which has been abrogated. See United States v. Cartano, 420 F.2d 362, 365 (1st Cir., 1970). We conclude that whether a represented defendant may himself address the jury lies within the discretion of the trial judge.

## C. *Claim that the jury should be told it is not bound by the judge's statement of the law.*

■ The principle, contrary to this claim by defendants, that it is the duty of the jury to apply the law as declared by the court (notwithstanding the finality of an acquittal inconsistent with the law, and the resulting "pardoning power" of the jury) was firmly established by the Supreme Court in Sparf v. United States, 156 U.S. 51, 106, 15 S.Ct. 273, 39 L.Ed. 343 (1895).

As said by the first circuit in a criminal case, "Today jurors may have the power to ignore the law, but their duty is to apply the law as interpreted by the court, and they should be so instructed."[94] The Court of Appeals for the District of Columbia has recently decided that the jury is not to be instructed that it has the prerogative-in-fact to bring in a verdict of not guilty that is not reversible by the court.[95] The Court of Appeals for the Ninth Circuit reached the same result.[96]

## D. *Exclusion of testimony of Ramsey Clark.*

We do find merit in one complaint of defendants, and so state because the situation could arise again in the event of another trial.

Defendants subpoenaed former Attorney General Ramsey Clark as a witness in their behalf. Government counsel was apprehensive that the defense would ask questions for the purpose of eliciting inadmissible testimony and that by reason of Mr. Clark's status as a former cabinet officer and chief legal officer of the government at the time of the events, defense counsel could succeed thereby in leaving erroneous and prejudicial impressions with the jury.

At the request of the government the court conducted a voir dire in the absence of the jury to determine whether testimony which might be elicited would be admissible. Then the court ruled that defendants failed "to demonstrate that the witness could make a relevant or material contribution," and sustained the government's objection to having Mr. Clark testify.

■ The procedure followed is indeed unusual. We have found no case in which a court required a witness who was not resisting being called to submit to voir dire on relevancy before questions could be put to him in ordinary course in the presence of the jury. There have been suggestions that there may be situations calling for "such a before-the-fact proceeding intended to avoid possible abuse."[97] We think that such departure

---

cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

93. The judge also said that there is no right to hybrid representation by both defendant and counsel. See Lee v. State of Alabama, 406 F.2d 466, 469 (5th Cir., 1969) ; Duke v. United States, 255 F.2d 721, 725 (9th Cir., 1958), cert. denied 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 1365.

94. United States v. Boardman, 419 F.2d 110, 116 (1st Cir., 1969), also explaining

holding of United States v. Spock, 416 F.2d 165 (1st Cir., 1969). See also United States v. Moylan, 417 F.2d 1002, 1006 (4th Cir., 1969).

95. United States v. Dougherty (D.C.Cir., 1972), 473 F.2d 1113.

96. United States v. Simpson, 460 F.2d 515, 518–520 (9th Cir., 1972).

97. United States v. Bohle, 445 F.2d 54, 74 (7th Cir., 1971) ; Gajewski v. United States, 321 F.2d 261, 269 (8th Cir., 1963).

from the normal procedure should be directed only when an intention to engage in prejudicial conduct is clearly shown.

■ But whether or not the procedure was justified here by previous conduct of defense counsel, as urged by the government, the court erred in excluding one portion of Mr. Clark's testimony.

The court should have permitted Mr. Clark to testify that he telephoned Mayor Daley in July, 1968. An important part of the defense was the claim that the city administration's refusal to negotiate about parade permits and other accommodations, and the hard line it followed contributed to the violence that occurred. The defendants offered testimony to show that Davis and others had attempted many times without success to make contact with city officials; that only when the Chicago office of the Community Relations Service became involved, after July 8, was there any response from the city, and then only by persons who had no authority to grant permits. The defense offered testimony that on July 25 the mayor did meet with Justice Department officials from Washington, Wilkins and Pomeroy, after which the Washington officials and the United States Attorney met with Davis. Mr. Clark on voir dire testified that he telephoned Mayor Daley prior to July 25 but after he received a report from Wilkins, who had been in Chicago, and that as a result of that conversation the mayor met with Wilkins and Pomeroy. The government did not contest the relevancy of this fact. In the context of the defense theory, it could have been significant that it may have required a telephone call from the Attorney General of the United States to move the mayor into negotiations with these groups. It would, at least, have added a dimension to the defense's version of the facts, and therefore it should not have been excluded.

■ This court has held that where a witness is able to offer relevant, competent and material evidence as to any issue in the trial, the fact that he holds office and thereby enjoys prestige does not disqualify him as a witness, nor make his testimony prejudicial. United States v. Cerone, 452 F.2d 274, 288 (7th Cir., 1971).

The judgments appealed from are reversed and the cause remanded for a new trial if the government elects so to proceed.

PELL, Circuit Judge (dissenting in part, concurring in part).

This appeal is before a panel of this court on a vehicle consisting of more than 22,000 numbered transcript pages and some 2485 pages of parties' briefs, using that term in no descriptive sense. Of necessity, brevity has not been permitted to enter the picture in the panel's majority opinion. It is with considerable reluctance that I am confronted with that which I deem a necessity, the expression of divergent views which will add more pages. However, I entertain no doubts but that the statute under which the appellants were prosecuted is facially unconstitutional in that it is clearly violative of the First Amendment right of freedom of speech.

My reluctance, overridden by the importance of the issue, is compounded by at least two additional factors, probably of greater significance than the mere desire to avoid length. First, prior to the present appeal, a panel of this court unanimously had held that a district court was correct in dismissing a challenge to the constitutionality of the statute. The holding there was that the attack upon the statute did not even present a substantial constitutional question. National Mobilization Committee v. Foran, 411 F.2d 934 (7th Cir. 1969), aff'g, 297 F.Supp. 1 (N.D.Ill.1968). While not writing on a clean slate, I have put aside my ordinary respect for the essentiality of adherence to stare decisis principles and my disinclination to deviate therefrom because of the fact that one of the controlling aspects of unconstitutionality was not presented to the panel, because the Supreme Court subsequently decided what I consider a

dispositive case, and because, on final analysis, my reading of the statute can lead to no other result.

Secondly, the particular case before us is not one which induces any subjective desire on my part to add reasons to those already advanced by the majority opinion for reversal. Candor compels recognition that this case is not of the ordinary type coming before this court. While our appellate jurisdiction customarily confines us to the record before us —using "record" in the narrow legal sense of that term—none of us can be oblivious of the status that the trial of this case has assumed in the minds of a very substantial number of members of the public. Putting it very simply, that status, often vigorously expressed, is that the courtroom in which the trial was conducted was a forum in which were arrayed on one side the forces of law and order and on the other side persons representative of designedly disruptive anarchy. Any basis for reversal is bound to be viewed by many as a victory for those who would destroy this country. In fairness, many others are possessed of completely contrary views of the trial and the incidents leading thereto. I express no views on these differing evaluations other than to recognize their existence and their inherent pulls which for our judicial function must be put firmly aside. "The judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government." Stamler v. Willis, 415 F.2d 1365, 1369–1370 (7th Cir. 1969).

I do, however, express, as a further threshold matter, the view that saying there could be no possibility of persons, individually or collectively organized, crossing our state boundaries with the express intent of bringing about a riot is to look at political history with naiveté. I therefore also, as a corollary, am of the opinion that a federal statute could be drawn, sufficiently narrow and precise, to accomplish punishment of such activity without running afoul of First Amendment rights. In my view, that was not done here.

The legislative history of the so-called "Anti-Riot Statute of 1968," 18 U.S.C. §§ 2101 and 2102, while providing a broad field for law review article plowing, will not lengthily concern me here, attention instead being devoted primarily to the language which evolved from the legislative process. Freedom of speech, although seemingly accorded herculean stature in the platitudinous outpourings of Constitution Day orators, becomes, when out of the vacuum, "delicate and vulnerable," and the "threat of sanctions may deter [its] exercise almost as potently as the actual application of sanctions." N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Thus, it seems to me that we as a court should "not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects." Aptheker v. Secretary of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 1669, 12 L.Ed.2d 992 (1964).

Nevertheless, by way of background, it must be noted that in the mid-1960's, Congress gave serious attention to national anti-riot bills. "These bills are a response to a grave national problem —the outbreak of riots and other violent incidents in a good number of cities in various sections of the country."[1] Debate reflected a belief, at least on the part of some, that the riots just did not happen spontaneously but were the planned work of professional agitators whose home bases frequently did not coincide with the geographical state of the occurrence.

It was not overlooked in Congress that the agitator must ordinarily communi-

1. Statement of John Doar, Assistant Attorney General, before Subcommittee No. 5 of the House Committee on the Judiciary, October 5, 1966.

cate by speech, which, in turn, would necessitate the possibility that controls imposed on agitators might infringe First Amendment rights. In a letter to the chairman of the House Judiciary Committee, from Assistant Attorney General Doar, on October 11, 1966, the following was stated:

"The term 'inciting a riot' should be defined in the Act. The definition must recognize that incitement is a form of expression, and should specifically state that expression protected by the First Amendment—the mere advocacy of ideas and the mere expression of belief—is not included within the scope of the Act. In light of Herndon v. Lowry, 301 U.S. 242 [57 S.Ct. 732, 81 L.Ed. 1066], such a definition might be structured along the following:

"Inciting a riot shall mean urging or instigating other persons to riot, where such urging or instigating is done at a time and place and under such circumstances as to create an imminent danger of a riot occurring, and shall not mean the mere advocacy of ideas or the mere expression of belief."

National legislation on the subject did not proceed apace. However, the statute with which we are now concerned did finally come into being in April 1968. Interim discussion, which may have only articulated personal and individual viewpoints of a few, reflected that those who incite to violence should be punished whether or not freedom of speech was impaired, but at least the 1967 House bill (HR421) contained an exclusion in the definition of inciting a riot of "the

mere advocacy of ideas or the mere expression of belief." Without laboring the matter into extended specificity, a fair appraisal indicates that a push for Senate passage of what is essentially the present statute occurred early in March 1968. The Attorney General, in accordance with his previous recommendations, submitted on behalf of the President a bill containing the following language:

"(c) To incite or organize a riot shall mean urging or instigating other persons to riot, where such urging or instigating is done at a time and place and under such circumstances as to further the course of an existing riot or to create an imminent danger of a riot occurring, and shall not mean the mere advocacy of ideas or the mere expression of belief." 114 Cong.Rec. 5213 (March 5, 1968)

The appellants' summary of the ensuing events, unchallenged factually by the Government, is as follows:

"Despite pleas by various Senators to consider the Administration version in view of, as one Senator put it 'the very delicate constitutional questions [which] are involved here',[2] the Thurmond amendment, containing the text of the present Act, was pushed to a successful vote by its supporters, thus rejecting the President's plea for 'a narrow and carefully drawn' piece of legislation." [3]

That the legislation as finally passed was something less than a model of draftsmanship is illustrated by the obscurantism of 18 U.S.C. § 2101(b),[4] which on analysis would seem to say that proof that a defendant had engaged in an overt act and had travelled in in-

2. See remarks of Senator Harris, 114 Cong.Rec. 5213 (March 5, 1968).

3. See letter from Attorney General, accompanying proposed bill, 114 Cong.Rec. 5213 (March 5, 1968).

4. § 2101(b): "In any prosecution under this section, proof that a defendant engaged or attempted to engage in one or more of the overt acts described in subparagraph (A), (B), (C), or (D) of paragraph (1) of subsection (a) and (1) have [sic] traveled in interstate or foreign commerce, or (2) has use of or used any facility of interstate or foreign commerce, including but not limited to, mail, telegraph, telephone, radio, or television, to communicate with or broadcast to any person or group of persons prior to such overt acts, such travel or use shall be admissible proof to establish that such defendant traveled in or used such facility of interstate or foreign commerce."

terstate commerce would be admissible proof that he had travelled in interstate commerce.

The crucial subsection here, however, which did not follow the suggestion of the Attorney General, is 18 U.S.C. § 2102(b), reading as follows:

"(b) As used in this chapter, the term 'to incite a riot', or 'to organize, promote, encourage, participate in, or carry on a riot', includes, but is not limited to, *urging* or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, *not involving* advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." (Emphasis added.)

The majority opinion does "not pretend to minimize the First Amendment problems presented on the face of this statute," and in my opinion rightly does not. While the exposition of the constitutional problems in the majority opinion sometimes borders on being an apologia for inept legislative draftsmanship ("awkward phraseology" according to the Government), nevertheless, I am in accord with much of the acute analysis of the underlying issues as written by Judge Fairchild. It is only when we near the doorway of disposition that our paths part.

The matter of the so-called "double negative" is to me the first determinative step leading to and through the gateway of First Amendment violations. This matter was not presented to nor considered by the panel of this court in *Foran, supra.* There would have been no problem if the final part of § 2102(b) had been written: ". . . but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, *even though* involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." That is the construction for which the Government perforce must in effect contend. Alternatively,

there would have been no problem on this particular score if the wording had terminated with the word "belief." Neither of these wordings, however, was utilized.

To suggest that the tacked-on phrase was deliberately inserted in the legislation to cause invalidity would seem to evoke a violent assumption. This does not mean, however, considering the nation-wide array of violence and riots about which members of Congress certainly were the recipients of much correspondence from disturbed constituents, that there were not legislators who, despite the admonitions of the Attorney General, were of the belief that punishment should be visited upon any who merely advocated the idea of violence or expressed belief in the rightness thereof. The legislative history does not necessarily dispel such meaning. With all respect, the majority's attempted saving construction that the phrase was inserted by the drafters to forestall a First Amendment defense in the case of a truly inciting, action-propelling speech, is not only strained beyond reasonable acceptability but is unsupported historically. Further, such a construction provides no guidance for the interstate traveller who intends to speak of the rightness of violence as a last resort solution to whatever problem of civilization concerns him. He will be caught in the same net as the true inciter, and the context of his remarks as well as the reaction of his audience, possibly unwarranted and unanticipated, will provide the peril of his being subject to grand jury scrutiny and eventual punishment at the statutorily uncontrolled option of a comminatory prosecutor.

"The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736,

742, 84 L.Ed. 1093 (1940). I have not intended to direct any unfavorable criticism toward any official charged with the duty of prosecuting under the Anti-Riot statute. In examining a statute with regard to its availability for constitutional abuse, the view cannot be confined to known officials with their known tendencies and philosophies but must include those who may be in the positions tomorrow and the tomorrows thereafter.

I am able to reach no conclusion other than that the added phrase was intended to preclude, under pain of prosecution, advocacy of violence even though only an idea or expression of belief. It is repugnant to our ideas of, and our hopes for, civilization that resort to violence should ever be necessary. Self-defense might seem ordinarily to be an exception, but ideally civilization should develop to the point of obviating even this necessity. Civilization, however, unfortunately has not progressed to this point, nor to the point where there are not believers that one way or another it could stand improvement. Nevertheless, in our panoply of constitutional mandates none exceeds, in my opinion, the significance in its impact upon a free, even though not yet ideal, civilization, that of freedom of speech.

Thus, though we, or at least the substantial majority of us, may find it abhorrent to think that the rightness of violence should ever be advocated, even though expressed as an idea or belief, nevertheless, the distaste must be overridden in the preservation of the essential freedom here at stake.

This necessity is made quite clear in Brandenburg v. Ohio, 395 U.S. 444, 447–448, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), in which the Supreme Court in a unanimous per curiam opinion, after referring to the discrediting by subsequent opinions of Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L. Ed. 1095 (1927) (which had upheld the California Criminal Syndicalism Act), stated as follows:

"These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. As we said in Noto v. United States, 367 U.S. 290, 297–298 [81 S.Ct. 1517, 1520–1521, 6 L. Ed.2d 836] (1961), 'the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' See also Herndon v. Lowry, 301 U.S. 242, 259–261 [, 57 S.Ct. 732, 739–740, 81 L.Ed. 1066] (1937); Bond v. Floyd, 385 U.S. 116, 134 [87 S.Ct. 339, 348, 17 L.Ed.2d 235] (1966). A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control." (Footnote omitted.)

While this court did not rely on *Whitney* in its *Foran* decision, nevertheless, it is of more than casual significance that the *Brandenburg* opinion was handed down subsequent to that in *Foran*. In *Foran*, the court correctly points out that there must be a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices, 411 F.2d at 939. The fault of the statute here when reread in the light of the teaching of *Brandenburg* is that the purported speaker who travels in, or uses the facilities of, interstate or foreign commerce is not provided with the specifically drawn line between protected and violative utterances.

The majority opinion in the case before us, aside from the double negative issue, would seem to find salvation for

the statute by construing "to incite a riot" as referring to words which are sufficiently likely to propel the violent action to be identified with action. The conclusion is then reached that the crucial word "urge" in § 2102(b) embodies the required relation of expression to action. With this I am unable to agree. The range of shadings of meanings of the word "urge" in Webster's Third New International Dictionary (Unabridged, 1966), in addition to constituting a semantical morass, would provide simultaneously a basis for prosecution and a defense to the prosecution. Thus, the prosecution can point to the meaning as being that of exercising an inciting influence. The defense can counter by showing that a presentation in an earnest manner is an equally acceptable definition.

This result might be otherwise if one meaning was the only definition or was the commonly accepted definition and the other or others were archaic, obscure, dialect or of similar category. That is not the situation here. I find no compulsion in the definitions toward the narrow one needed to sustain the statute without "judicially rewriting it." *Cf.* Aptheker v. Secretary of State, *supra*, 378 U.S. at 515, 84 S.Ct. 1659.

Further, I do not find any basis in the statute to cause me to read a restricted meaning into the word. I do not, in sum, see in the statute the guidelines by which the speaker in favor of the rightness of violence can make a safe determination. If he merely goes beyond the bare statement of the proposition by stating not only that violence is right to correct a particular abuse but that it is imperative, it seems he is within the orbit of "urging," indeed, he maybe already be impaled by his sincerity in positing his basic proposition.

Further, and of equal significance, the present statute does not by clear intendment meet the *Brandenburg* pronouncement that advocacy is unprotected only where it is directed to inciting or producing imminent lawless action and is likely to incite or produce such action, 395 U.S. at 447, 89 S.Ct. 1827. The importance of this qualification was contained in the Attorney General's letter set out hereinbefore. The advice was not heeded.

I also find an overly broad sweep in § 2101(a)(1) in the inclusion of the word "thereafter." This subsection is the basic statement of the offense. Stripped of modifying and alternative verbiage, the subsection subjects to fine and imprisonment one who travels in interstate commerce with intent to incite a riot and thereafter incites a riot. There is no required causal relationship between the travel with intent and the riot actually incited. No necessary connection whatsoever need be shown between them nor is there any time limitation as to when the overt act shall take place with relationship to the travel. I cannot conceive the constitutional validity of a statute which in this open-ended manner punishes a person at the federal level for what would otherwise be a local crime only because at some time in his past he had crossed a state line or had used a facility of interstate commerce with a nefarious intent. In the example above, I used actual inciting, but the same result would be applicable if the original travel was with the intent of aiding some other person in participating in a riot. No convicted criminal on probation is placed under such severe nonterminal strictures.

Sometimes people are prone to speak offhandedly and perhaps slightly inaccurately of well-established or cherished concepts without resort to the exact text of the source. The plain language of the First Amendment to the Constitution of the United States of America is "Congress shall make no law . . . abridging the freedom of speech. . . . " While "freedom of speech" is not an absolute right and proper curbs have been spelled out by the judiciary, *e. g.*, in the area of libel,[5] the word

5. Likewise (and inasmuch as no freedom of speech opinion would be complete without reference to the traditional example) yelling "fire" in a crowded theater.

"speech" itself is not qualified by a limitation of subject matter to innocuous mundanities. Imaginative or stirring ideas and idealistic beliefs are equally within its sweep. Speech without effective communication is not speech but an idle monologue in the wilderness. Communication involves listeners. A "law" which upon reasonable construction would, by its deterrent threat of punishment for the mere expression of ideas or beliefs, cellularly isolate the speaker from potential listeners in all of the states of the Union except his own would, in my opinion, abridge freedom of speech.

Other arguments of facial unconstitutionality are advanced by the appellants, some of which may have arguable merit in view of the imperfect draftsmanship reflected in this statute, to which there has been previous reference herein. Thus, in the § 2102(a) definition of "riot" the word "disturbance" is used. As stated by Judge Will in Landry v. Daley, 280 F.Supp. 968, 971 (N.D.Ill. 1968), "New ideas more often than not create disturbances, yet the very purpose of the First Amendment is to stimulate the creation and dissemination of new concepts."

Somewhat the same thought was expressed by Alfred North Whitehead, English philosopher and mathematician, "Great ideas often enter reality in strange guises and with disgusting alliances." Whitehead, Adventures of Ideas (1933).

Also, the overly broad language of the statute already referred to has other constitutional significance in its discouraging impact on the freedom to travel.

"This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." Shapiro v.

Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969).

Since the question before is not to propose constitutionally acceptable guidelines for a national anti-riot statute but rather to scrutinize on constitutional grounds the statute actually enacted, I do not deem it necessary to consider each of the numerous bases of challenge advanced by the appellants. Those I have discussed appear to me to be the principal ones and more than sufficient for a successful challenge.

The scope of judicial inquiry has been aptly stated by Chief Justice Warren in United States v. Robel, 389 U.S. 258, 267–268, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), as follows:

"It is not our function to examine the validity of that congressional judgment. . . . We are concerned solely with determining whether the statute before us has exceeded the bounds imposed by the Constitution when First Amendment rights are at stake. The task of writing legislation which will stay within those bounds has been committed to Congress. Our decision today simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms. *Shelton* v. *Tucker*, *supra* [364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)]; cf. *United States* v. *Brown*, 381 U.S. 437, 461 [85 S.Ct. 1707, 14 L.Ed.2d 484] (1965). The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less."

The footnote to the quoted portion of the opinion (at p. 268, 88 S.Ct. 419 at p. 426) also is meaningful to the case before us in the refusal to balance the governmental interests expressed in the statute against the First Amendment rights asserted by an individual.

The rationale for the refusal was put as follows:

"We recognize that both interests are substantial, but we deem it inappropriate for this Court to label one as being more important or more substantial than the other. Our inquiry is more circumscribed. Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal. In making this determination we have found it necessary to measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment. But we have in no way 'balanced' those respective interests. We have ruled only that the Constitution requires that the conflict between congressional power and individual rights be accommodated by legislation drawn more narrowly to avoid the conflict."

In the case before us, I would hold that the statute was not drawn sufficiently narrowly to avoid the conflict and that the convictions must be reversed because of being grounded on an unconstitutional enactment. Inasmuch as the majority of the panel have reached a contrary result and inasmuch as this court is not one of final resort, I address myself to the remainder of the majority opinion only on the basis of an arguendo assumption of statutory constitutionality.

Every judge writing an appellate court opinion will probably phrase similar analysis and result somewhat differently. The difficult issues and extensive record before us make it unlikely that the present case would be an exception. Thus, while I might not have approached some of the issues in exactly the same manner, nor used identical language, upon my consideration of the results reached as to the issues covered, other than those pertaining to statutory constitutionality, I concur in the majority opinion.

As this opinion was in the process of being finally drafted, the people of the world were stunned and shocked by the terroristic violence occurring at the site of the 1972 Olympic games. Indubitably the shock will be followed by popular demand for suppression of violence as a political weapon. An ideal state of civilization should find no person in any jeopardy of loss of life or wellbeing from violence irrespective of its motivation. To attain that state, however, by suppression of the free interchange of ideas and beliefs would be a pyrrhic sacrifice of a precious freedom for an illusory safety. It is because of my underlying belief in the preservation of that freedom that I have written as I have herein. My brothers of the panel share my views on the importance of the preservation but do not find the cause for alarm that I do in this particular statute.